Dissenting opinion filed by Circuit Judge RANDOLPH.
ROGERS, Circuit Judge:
In In re Sealed Case, 121 F.3d 729 (D.C.Cir.1997), the court, in considering a grand jury subpoena for White House documents relating to an investigation of the former Secretary of Agriculture, reviewed the history of the executive privilege doctrine, and the nature and principles underlying two privileges falling within that doctrine. We apply that analysis in deciding whether, under Exemption 5 of the Freedom of Information Act (“FOIA”), 5 U.S.C. § 552(b)(5), the presidential communications privilege extends into the Justice Department to internal pardon documents in the Office of the Pardon Attorney and the Office of the Deputy Attorney General that were not “solicited and received,” id. at 752, by the President or the Office of the President.[1] In refusing to release certain *1110 documents in response to Judicial Watch’s FOIA requests, the Deputy Attorney General, to whom the Attorney General has delegated his pardon duties, invoked the deliberative process privilege. However, in moving for summary judgment, the Department also relied on the presidential communications privilege. On appeal, Judicial Watch contends that the district court erred in extending the presidential communications privilege to these internal Department documents. We agree, and accordingly we reverse, in part, the grant of summary judgment to the Department and remand the case for the district court to determine whether the Department’s internal documents not “solicited and received” by the President or the Office of the President are protected from disclosure under the deliberative process privilege. We affirm the grant of summary judgment to the Department on the documents withheld under FOIA Exemption 6, and on Judicial Watch’s request for a blanket waiver of FOIA processing fees.
I.
In January and February 2001, Judicial Watch filed-two FOIA requests for documents from the Justice Department. One request was to the Office of the Pardon Attorney, and the other was to the Office of the Deputy Attorney General. In each FOIA request, Judicial Watch sought release of “[a]ny and/or all [pjardon [gjrants” by former President Clinton in January 2001, and “[a]ny and/or all pardon applications considered” by former President Clinton.[2] Judicial Watch’s request for expedited processing under 28 C.F.R. § 16.5(d)(l)(iv), was denied, and the Department began releasing documents in February 2001,- including some without prepayment of the FOIA processing fee. See 28 C.F.R. § 16.11(i)(2). Although it released thousands of pages of documents, the Department withheld 4,341 pages pursuant to FOIA Exemption 5, see 5 U.S.C. § 552(b)(5), and, to the extent these pages contained personal information about living individuals, pursuant to FOIA Exemption 6. Id. § 552(b)(6). The Department separately withheld another 524 pages under Exemption 6.
The withheld documents are described by the Department in a Vaughn Index[3], which organizes the records into 34 categories and specifies the particular privileges invoked for each document, with the presidential communications privilege and deliberative process privileges invoked either in full or in part. The 4,341 documents withheld under both the presidential com *1111 munications and deliberative process privileges, either in Ml or in part, can be grouped into several broad categories. For instance, a number of withheld documents consist of letters and reports from the Deputy Attorney General to the President, advising the President on individual pardon petitions. See Vaughn Index 5,19, 32. A second group of withheld documents consist of communications between the Department and the White House Counsel’s Office concerning pending pardon applications, and communications between the White House Counsel and the President discussing the Department’s recommendations. See id. 3, 16, 18, 26. A third broad category of documents are proposed recommendations for the Deputy Attorney General’s consideration, which were authored by the Deputy Attorney General’s staff or the Pardon Attorney. See id. 1, 10, 11, 13, 14, 27, 28. A fourth category consists of internal communications and working documents among and between the Deputy’s Office and the Pardon Attorney, such as memoranda from the Deputy’s staff to the Pardon Attorney inquiring about specific pardon applications and requesting that certain pardon recommendations be modified or resubmitted to the Deputy. See id. 2, 4, 7, 20, 21, 22, 25, 29, 30. A fifth category consists of communications with and documents received from other agencies and departments in the course of preparing the Deputy’s pardon recommendations for the President, such as FBI memoranda on background investigations. See id. 17, 23, 33. Other documents are either miscellaneous lists or drafts or are difficult to categorize because they appear to be internal departmental memoranda but actually incorporate specific recommendations the Deputy had submitted for the President. See id. 6, 8, 9, 12, 15, 19, 24, 31. With the exception of category 34 — involving 524 documents, which the Department withheld under Exemption 6, consisting of pardon petitions and letters to or from pardon applicants and their counsel and supporters — the Department posits that all of these documents fall under the purview of the presidential communications privilege.
In March and April 2001, Judicial Watch sued the Department to enforce the FOIA requests and to challenge the denial of a blanket waiver of FOIA processing fees. The district court consolidated the cases, and the Department moved for summary judgment. The district court agreed with the Department that all 4,341 pages were properly withheld under the presidential communications privilege pursuant to Exemption 5. Rejecting Judicial Watch’s position that the privilege does not apply to documents not involving White House staff, the district court concluded that because the materials had been produced for the “sole” function of advising the President on a “quintessential and nondelegable Presidential power,” the extension of the presidential communications privilege to internal Justice Department documents was justified. The district court also agreed that the Department had properly withheld 524 pages of documents, consisting primarily of individual petitions for pardons, under Exemption 6. Upon reconsideration, the court also granted the Department’s motion for summary judgment on the fee waiver request, finding that Judicial Watch had failed to show that the FOIA requests were likely to contribute significantly to the public interest.
On appeal, Judicial Watch challenges the district court’s rulings under Exemptions 5 and 6 and the denial of the blanket waiver of FOIA fees. Our review of the grant of summary judgment is de novo. See Assassination Archives & Research Ctr. v. Cent. Intelligence Agency, 334 F.3d 55, 57 (D.C.Cir.2003); Johnson v. Executive Office for U.S. Attorneys, 310 F.3d 771, 774 (D.C.Cir.2002); Nation Magazine v. Unit *1112 ed States Customs Serv., 71 F.3d 885, 889 (D.C.Cir.1995). We address Exemption 5 in Part II, Exemption 6 in Part III, and the fee waiver in Part IV.
II.
This FOIA case calls upon the court to strike a balance between the twin values of transparency and accountability of the executive branch on the one hand, and on the other hand, protection of the confidentiality of Presidential decision-making and the President’s ability to obtain candid, informed advice. In striking this balance, the court must determine the contours of the presidential communications privilege with respect to the President’s pardon power under Article II, Section 2, of the Constitution in light of the organization of the executive branch with regard to pardon applications, investigations, and recommendations. One view, advocated by the Department, is that protection of the institution of the Presidency requires that the presidential communications privilege apply to all documents authored by any executive branch agency employee that are generated in the course of preparing pardon recommendations for the President. The district court adopted this functional approach, finding that the presidential communications privilege applied to the requested documents because the Pardon Attorney’s “sole” responsibility was to advise the President on pardon applications. Under this approach, the Pardon Attorney is, in effect, a White House adviser, rendering the presidential communications privilege applicable to all pardon-related documents notwithstanding the location and staff function of the Pardon Attorney in the Justice Department.
Another view, espoused by Judicial Watch, is that, in harmony with the FOIA’s purpose, the principles underlying the presidential communications privilege limit its reach to documents and other communications “solicited and received” by the Office of the President, and thus do not extend to agency documents that are not submitted for Presidential consideration. Under this view, which we endorse, internal agency documents that are not “solicited and received” by the President or his Office are instead protected against disclosure, if at all, by the deliberative process privilege. We begin our analysis with the FOIA statute and then turn to the presidential communications privilege and the organization of the pardon process in the executive branch.
The FOIA directs that “each agency, upon any request for records ..., shall make the records promptly available to any person” for “public inspection and copying,” unless the records fall within one of the exclusive statutory exemptions. See 5 U.S.C. §§ 552(a)(2) & (a)(3)(A). There is, however, a built-in presidential communications privilege for records in the possession of, or created by, immediate White House advisers, who are not considered an agency for the purposes of FOIA. See supra note 1. The FOIA amended the public disclosure section of the Administrative Procedure Act, 5 U.S.C. § 1002, which had been viewed, for a variety of reasons, as “falling short” of the disclosure goals of the statute. EPA v. Mink, 410 U.S. 73, 79, 93 S.Ct. 827, 831, 35 L.Ed.2d 119 (1973). The Supreme Court has long recognized that Congress’ intent in enacting FOIA was to implement “a general philosophy of full.agency disclosure.” United States Dep’t of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 754, 109 S.Ct. 1468, 1471, 103 L.Ed.2d 774 (1989)(quoting Dep’t of the Air Force v. Rose, 425 U.S. 352, 360-61, 96 S.Ct. 1592, 1598, 48 L.Ed.2d 11 (1976)). The Supreme Court has explained that,
Without question, the Act is broadly conceived. It seeks to permit access to official information long shielded unnec *1113 essarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands.
Mink, 410 U.S. at 80, 93 S.Ct. at 832. In weighing opposing interests, Congress has instructed that “[sjuccess lies in providing a workable formula that encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure.” S.Rep. No. 813, p. 3, quoted in Mink, 410 U.S. at 80, 93 S.Ct. at 832. Accordingly, FOIA’s exemptions are to be narrowly construed. See United States Dep’t of Justice v. Tax Analysts, 492 U.S. 136, 151, 109 S.Ct. 2841, 2851, 106 L.Ed.2d 112 (1989); Rose, 425 U.S. at 361, 96 S.Ct. at 1599. See also 5 U.S.C. § 552(d); Bristol-Myers Co. v. FTC, 424 F.2d 935, 938 (D.C.Cir.1970), cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970).
FOIA Exemption 5 allows the government to withhold “inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency.” 5 U.S.C. § 552(b)(5). This language has been interpreted as protecting against disclosure those documents normally privileged in the civil discovery context. See Mink, 410 U.S. at 91, 93 S.Ct. at 837. This includes documents protected under the executive privilege doctrine. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 n. 16 & 150, 95 S.Ct. 1504, 1515 n. 16, 1516, 44 L.Ed.2d 29 (1975). As described in In re Sealed Case, 121 F.3d at 737, the deliberative process privilege under Exemption 5 protects “confidential in-tra-agency advisory opinions” and “materials reflecting deliberative or policy-making processes.” Mink, 410 U.S. at 86, 89, 93 S.Ct. at 835, 836 (citations omitted). It rests on the policy of protecting the “decision making processes of government agencies,” Sears Roebuck, 421 U.S. at 150, 95 S.Ct. at 1516 (citations omitted), with the “ultimate purpose [being] to prevent injury to the quality of agency decisions.” Id. at 151, 95 S.Ct. at 1516. Materials that are “predecisional” and “deliberative” are protected, while those that “simply state or explain a decision the government has already made or protect material that is purely factual” are not. In re Sealed Case, 121 F.3d at 737. The deliberative process privilege, however, is qualified and can be overcome by a sufficient showing of need. See id.
Exemption 5 also has been construed to incorporate the presidential communications privilege. See Sears Roebuck, 421 U.S. at 149 n. 16 & 150, 95 S.Ct. at 1515 n. 16, 1516. In United States v. Nixon, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) (“Nixon /”), which involved a grand jury subpoena for tape recordings of President Nixon’s conversations in the Oval Office, the Supreme Court instructed that there is “a presumptive privilege for Presidential communications,” which is “fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.” Later, in Nixon v. Administrator of General Services, 433 U.S. 425, 449, 97 S.Ct. 2777, 2793, 53 L.Ed.2d 867 (1977) (“Nixon II”), in addressing the President’s challenge to a statute providing for screening by government archivists of his papers and recorded conversations, the Supreme Court emphasized Nixon 7’s holding that “the .privilege is limited to communications ‘in performance of (a President’s) responsibilities,’ ‘of his office,’ and made ‘in the process of shaping policies and making decisions.’ ” (citations omitted). As analyzed by this court in In re Sealed Case, 121 F.3d at 744, “[t]he President can invoke the privilege when asked to produce documents or other materials that reflect presidential decision-making and deliberations and that the President believes should remain confidential.” Unlike the *1114 deliberative process privilege, which is a general privilege that applies to all executive branch officials, the presidential communications privilege is specific to the President and “applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliber-ative ones.” Id. at 745. The presidential communications privilege thus is a broader privilege that provides greater protection against disclosure, although it too can be overcome by a sufficient showing of need. See id. at 746.
Although Judicial Watch contends that the presidential communications privilege was not properly invoked, see In re Sealed Case, 121 F.3d at 744-45 n. 16; Center on Corp. Responsibility, Inc. v. Shultz, 368 F.Supp. 863, 872-73 (D.D.C.1973); United States v. Burr, 25 F. Cas. 187, 192 (C.C.Va.1807)(No. 14,694), the court need not address the issue because Judicial Watch has waived this challenge by failing to raise it in the district court. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2876, 49 L.Ed.2d 826 (1976); Amax Land Co. v. Quarterman, 181 F.3d 1356, 1369 (D.C.Cir.1999); See also Soucie v. David, 448 F.2d 1067, 1071 (D.C.Cir.1971). Unlike in In re Sealed Case, 121 F.3d at 744-45 n. 16, where the affidavit of the White House Counsel stated that he was specifically authorized by the President to invoke the presidential communications privilege, the White House Counsel’s declaration here includes no such statement and there is no other indication that the President has invoked the privilege. However, the issue of whether a President must personally invoke the privilege remains an open question, see In re Sealed Case, 121 F.3d at 744-45 n. 16, and the court need not decide it now. Cf. United States v. Reynolds, 345 U.S. 1, 7-8, 73 S.Ct. 528, 531, 97 L.Ed. 727 (1953).
When the Supreme Court first acknowledged a separate privilege for presidential communications in Nixon I, 418 U.S. at 705, 94 S.Ct. at 3106, it was in the context of President Nixon’s invocation of the privilege to protect his personal conversations with his chief White House advisers in the Oval Office. Although the Court in Nixon I and II outlined the nature of the privilege in terms of its “constitutional underpinnings,” see Nixon I, 418 U.S. at 705-06, 94 S.Ct. at 3106, twenty years passed before, in In re Sealed Case, a court attempted to define the scope of the privilege more precisely. In In re Sealed Case, 121 F.3d at 746-47, the court was called upon to extend the privilege beyond communications directly involving and documents actually viewed by the President, to the communications and documents of the President’s immediate White House advisers and their staffs. In the instant case, the Department seeks a further extension of the presidential communications privilege to officials within the Justice Department whose sole function, according to the Department, is to advise and assist the President in the performance of his non-delegable pardoning duty. We decline to sanction such an extension of the presidential communications privilege to all agency documents prepared in the course of developing the Deputy Attorney General’s pardon recommendations for the President. Instead, consistent with the teachings of Nixon I and II and In re Sealed Case, we hold that the presidential communications privilege applies only to those pardon documents “solicited and received” by the President or his immediate White House advisers who have “broad and significant responsibility for investigating and formulating the advice to be given the President.” Id. at 752.
This limitation, conveniently summarized by In re Sealed Case’s phrase “solicited and received,” is necessitated by the principles underlying the presidential communications privilege, and a recognition of *1115 the dangers of expanding it too far. At core, the presidential communications privilege is rooted in the President’s “need for confidentiality in the communications of his office,” Nixon I, 418 U.S. at 712-13, 94 S.Ct. at 3109, in order to effectively and faithfully carry out his Article II duties and “to protect ‘the effectiveness of the executive decision-making process.’” In re Sealed Case, 121 F.3d at 742 (quoting Nixon v. Sirica, 487 F.2d 700, 717 (D.C.Cir.1973)). The privilege extends to the President’s immediate advisers because of the need to protect “candid,.objective, and even blunt or harsh opinions,” for, as the Supreme Court has recognized, “[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.” Nixon I, 418 U.S. at 708, 94 S.Ct. at 3107. However, in In re Sealed Case, the court recognized that, in determining whether “restricting the presidential communications privilege to communications that directly involve the President will ‘impede the President’s ability to perform his constitutional duty,’ ” 121 F.3d at 751 (quoting Morrison v. Olson, 487 U.S. 654, 691, 108 S.Ct. 2597, 2619, 101 L.Ed.2d 569 (1988)), there is, in effect, a hierarchy of presidential advisers such that the demands of the privilege become more attenuated the further away the advisers are from the President operationally. See id. at 752. Thus, as we demonstrate below, because pardon documents obtained from other agencies by Justice Department staff undergo various stages of intermediate review before pardon recommendations are submitted for consideration by the President and his immediate White House advisers, with some documents never making their way to the Office of the President, the same confidentiality and candor concerns calling for application of the presidential communications privilege in Nixon I and II and In re Sealed Case do not apply as forcefully here.
Although In re Sealed Case was not a FOIA case, it too involved a non-delegable duty of the President under Article II, Section 2 of the Constitution: the appointment and removál power for heads of Executive Departments and members of his Cabinet. The White House Counsel had conducted an investigation of alleged conflicts of interest of the Secretary of Agriculture and, on the basis of that investigation, had released a report to the public. A. grand jury issued a subpoena duces iecitm seeking all documents on the former Secretary possessed by the White House and any other documents “relating in any way to” the White House Counsel’s report. Id. at 734-35. When the White House withheld many of the documents under the deliberative process and presidential communications privileges, the . Office of Independent Counsel moved to compel production. The district court, upon conducting in camera review of the documents, ruled that the White House had properly invoked the presidential communications and deliberative process privileges. Id. at 735-36. On appeal, this court held that although all the documents sought were protected by the presidential communications privilege, the Independent Counsel had demonstrated a sufficient showing of need to obtaih some of the information in the documents, and remanded the case to the district court to determine what information should be released. Id. at 757.
Consistent with the principles underlying the presidential communications privilege, the court in In re Sealed Case espoused a “limited extension” of the privilege “down, the chain of command” beyond the President to his immediate White House advisers only, holding that “communications made by [such] presidential advisers in the course of prepar *1116 ing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President.” Id. at 749-50, 752. Emphasizing “the need for confidentiality to ensure that presidential decision-making is of the highest caliber, informed by honest advice and full knowledge,” id. at 750, the court also held that “the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.” Id. at 752 (emphasis added). However, the court emphasized the limited nature of its holding, cautioning against the dangers of “expanding to a large swath of the executive branch a privilege that is bottomed on a recognition' of the unique role of the President.” Id. The court instructed that “[n]ot every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege. In particular, the privilege should not extend to staff outside the White House in executive branch agencies.” Id.
While the Department attempts to discount the court’s instruction as mere dictum, it is unavoidably relevant for the purposes of defining the contours of the presidential communications privilege. In undertaking the task of conducting a more comprehensive analysis of the presidential communications privilege than had been done by the Supreme Court in Nixon I and II or any other court since then, the In re Sealed Case court’s statement limiting the sóope of the privilege to key White House advisers in the Office of the President and their staff cannot easily be divorced from the issues and concerns underlying its holding. Those issues and concerns are equally applicable here. The court in In re Sealed Case recognized the need to ensure that the President would receive full and frank advice with regard to his non-delegable appointment and removal power, but was also wary of undermining countervailing considerations such as openness in government. See id. at 749. Hence, the court determined that while “communications authored or solicited and received” by immediate White House advisers in the Office of the President and their staff could qualify under the privilege, communications of staff outside the White House in executive branch agencies that were not solicited and received by such White House advisers could not. See id. at 752. The court explained that only communications at the level of the immediate White House adviser’s staff “are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers.” Id. There is no indication in Nixon I or II or other Supreme Court jurisprudence 'that the boundaries set by In re Sealed Case were inappropriate. Rather, until In re Sealed Case, the privilege had been tied specifically to direct communications of the President with his immediate White House advisers. See Nixon I, 418 U.S. at 708, 94 S.Ct. at 3107; Nixon II, 433 U.S. at 448-49, 97 S.Ct. at 2792-93. The reluctance of the In re Sealed Case court to extend the presidential communications privilege beyond the limits of its requirements applies no less here.
Consequently, we proceed on the basis that “the presidential .communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President’s decision-making process is adequately protected.” In re Sealed Case, 121 F.3d at 752. Further extension of the privilege to internal Justice Department documents , that never make their way to the Office of the President on the basis that the documents were created for the sole purpose of advising the President on a non-delegable duty is *1117 unprecedented and unwarranted. The only documents at issue in In re Sealed Case were documents created within the White House or received by key White House advisers or their staff. The majority of the withheld documents were authored by two associate White House Counsel, the White House Counsel and Deputy Counsel, and the President’s Chief of Staff or Press Secretary. See id. at 757. Because these advisers were immediate White House staff in the Office of the President with significant responsibility for advising the President, the court held that these documents were protected by the privilege. See id. at 758. The few documents authored by a legal extern in the White House Counsel’s Office and the few that had no author were also held by the court to be protected by the privilege because they “were clearly created at the request of the two associate White House Counsel with broad and significant responsibility” for the White House Counsel’s investigation of the Secretary of Agriculture, and because the documents were received by these advisers. Id.
The Department now would have the court extend the presidential communications privilege to communications of persons in the Justice Department who are at least twice removed from the President, among and between the Offices of the Pardon Attorney and the Deputy Attorney General, as well as other agencies, that were never received by immediate White House advisers in the Office of the President. Undoubtedly a bright-line rule mandating application of the privilege to all departmental or agency communications related to the preparation of the Deputy Attorney General’s pardon recommendations'for the President would be easier to apply than a rule under which pardon communications not “solicited and received” by the Office of the President must be individually examined under the deliberative process privilege. But such a bright-line rule is inconsistent with the nature and principles of the presidential communications privilege, as well as the goal of best serving the public interest. See In re Sealed Case, 121 F.3d at 751-52. Communications never received by the President or his Office are unlikely to “be revelatory of his deliberations.” Id. at 752. Nor is there reason to fear that the Deputy Attorney General’s candor or the quality of the Deputy’s pardon recommendations would be sacrificed if the presidential communications privilege did not apply to internal agency documents. See id. 'Any pardon documents, reports, or recommendations that the Deputy Attorney General submits to the Office of the President, and any direct communications the Deputy or the Pardon Attorney may have with the White House Counsel or other immediate presidential advisers will remain protected. The In re Sealed Case court’s concern for providing “sufficient elbow room for [presidential] advisers to obtain information from all knowledgeable sources,” id., will also not be undermined. It is only those documents and recommendations of Department staff that are not submitted by the Deputy Attorney General for the President and are not otherwise received by the Office of the President, that do not fall under the presidential communications privilege. Although the potential for chilling the candor of the staffs of the Pardon Attorney or the Deputy Attorney General is greater than if everything produced in relation to pardon recommendations were covered under the privilege, because the deliberations of these staff are not close enough to the President to be revelatory of his deliberations and will in any event remain protected pursuant to the deliberative process privilege, the justification for expanding the presidential privilege that far disappears. See id.
Moreover, the President’s discretion and autonomy in granting pardons, see United *1118 States v. Klein, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871), which may be based on the Deputy Attorney General’s recommendations, the advice of his key White House advisers, or such other sources as he may seek out, counsel against further expansion of the privilege. It would be implausible, however, to conclude that documents that neither the President nor his key advisers receive from the Deputy Attorney General are part of the President’s personal decision-making process such that their exclusion from the scope of the privilege would impair the quality of his deliberations. For instance, the court can hardly conclude that examining documents such as an “[e]-mail within the Department of Justice, among officials in [the Office of the Deputy Attorney General] and [the Office of the Pardon Attorney] transmitting information on particular pardons, and requesting information, such as warrants and background investigations,” see Vaughn Index category No. 7, under the deliberative process privilege rather than the presidential communications privilege, would jeopardize the President’s confidentiality and decision-making process. Extending the presidential communications privilege to cover such internal Department documents would be both contrary to executive privilege precedent and considerably undermine the purposes of FOIA to foster openness and accountability in government. Indeed, a bright-line rule expanding the privilege could have the effect of inviting use of the presidential privilege to shield communications on which the President has no intention of relying in exercising his pardon duties, for the sole purpose of raising the burden for those who seek their disclosure. Such an approach would distort the rationale adopted by the Supreme Court in Nixon I and II and the principled analysis of this court in In re Sealed Case.
However, the Department contends that the Pardon Attorney is, in effect, a “member[ ] of an immediate White House adviser’s staff who ha[s] broad and significant responsibility for investigating and formulating the advice to be given the President.” In re Sealed Case, 121 F.3d at 752. Under this view, because the Pardon Attorney’s sole purpose is to advise the Deputy Attorney General, and ultimately, the President on pardon applications, and the Pardon Attorney either authored or compiled the documents sought, the documents are protected by the presidential communications privilege. But the Department’s view ignores the separate responsibilities of the Deputy Attorney General and the Pardon Attorney as well as the Pardon Attorney’s history of invoking the deliberative process privilege to protect the confidentiality of the Department’s internal pardon process.
The court has long recognized that the organization of governmental functions is of significance for the purposes of FOIA. In Ryan v. Dep’t of Justice, 617 F.2d 781, 789 (D.C.Cir.1980), the court observed that,
In many different areas the President has a choice between using his staff to perform a function and using an agency to perform it. While not always substantively significant, these choices are often unavoidably significant for FOIA purposes, because the Act defines agencies as subject to disclosure and presidential staff as exempt.
The court considered the President’s decisions about the location of advisers as reflective of his understanding of the access that the public could potentially have to government documents under FOIA. See id. at 789. Although the issue in Ryan involved the meaning of “agency records” under FOIA, namely, whether questionnaire responses of United States Senators sent to the Attorney General regarding their procedures for selecting and recom *1119 mending potential judicial nominees were “agency records,” the court’s analysis is nonetheless instructive. Just as the power to grant pardons is a quintessential and non-delegable Presidential duty, so too is the Article II, Section 2 power to select and appoint federal judges. There, as here, the President had delegated to the Attorney General the responsibility of evaluating potential nominees, receiving recommendations, and recommending candidates to the President. In performing this duty, the Attorney General solicited questionnaire responses from Senators on their procedures for recommending potential nominees, id. at 784, much as the Deputy Attorney General, through the Pardon Attorney, solicits responses from agencies on pardon applicants. While an inquiry into whether documents are “agency records” under FOIA is different from an inquiry into whether documents come within a FOIA exemption, each inquiry ultimately involves shielding government documents from public scrutiny — in these cases, on the basis that the documents were produced for the purpose of advising the President on a nondelegable Presidential duty.
The court in Ryan rejected a functional approach. It reasoned that although the documents were received for the purpose of advising the President on a nominating role that was exclusively his, id. at 786, adopting a functional approach to “defin[e] ‘agency records’ by the purpose for which they exist, would cut back severely on the FOIA’s reach as interpreted by courts since its inception.” Id. at 788. The court observed that judicial nominations, were “by no means unique as an instance where normal agency functions involve some element of giving advice to the President.” Id. at 787. For instance, the Office of Legal Counsel in the Justice Department exists to assist the Attorney General .in advising the President on major legal issues, a large portion of the Secretary of State’s functions is to advise the President in the conduct of foreign affairs, id. at 787-88, and the Central Intelligence Agency and the National Security Agency produce documents for the function of advising the President in his “solely presidential role of Commander-in-Chief.” Id. at 788. That reasoning is equally applicable here. Extension of the presidential communications privilege beyond the limits of In re Sealed Case to all documents prepared or received by the Pardon Attorney or his Office simply because they are produced for the sole function of assisting the Deputy Attorney General in presenting pardon recommendations for the President would have far-reaching implications for the entire executive branch that would seriously impede the operation and scope of FOIA.
However, rather than focusing on whether the internal Department documents are “agency records,” as in Ryan, we proceed on the basis that the Office of the Pardon Attorney, as an office within the Justice Department, is an agency subject to FOIA. See Crooker v. Office of Pardon Attorney, 614 F.2d 825, 827 (2d Cir.1980). It is the respective roles of the Deputy Attorney General and the Pardon Attorney in making pardon recommendations for the President that are significant for our analysis. The Department’s assertion' that the Pardon Attorney and his staff can be likened to “immediate White House adviser’s staff,” In re Sealed Case, 121 F.3d at 752, or as an extended arm of the White House Counsel’s Office, such that all documents authored or solicited and received by the Pardon Attorney fall under the protection of the presidential communications privilege, is untenable in light of the review and intermediate decision-making by the Deputy Attorney General. The declarations and attachments filed by the Department in the district court reveal that the Attorney General has delegated his advisory duties on pardons *1120 to the Deputy Attorney General, and within the Department, the Pardon Attorney assists the Deputy Attorney General in performing this duty, as well as “such other duties as may be assigned,” see 28 C.F.R. § 0.35(b), by the Attorney General or the Deputy Attorney General.[4] Thus, the Pardon Attorney receives, on behalf of the President, applications for pardons for federal criminal offenses, and in accordance with instructions from the Deputy Attorney General’s Office, conducts an investigation, calling upon other agencies such as the Internal Revenue Service, the Federal Bureau of Investigation, the U.S. Probation Office and U.S. Attorney in the District where the applicant was convicted. See 28 C.F.R. § 1.6(a). Staff in the Office of the Deputy review the Pardon Attorney’s proposed recommendations and investigatory report, and upon any necessary further investigation, prepare a report for the Deputy Attorney General. Ultimately, the Deputy Attorney General submits, on behalf of the Attorney General, his recommendations for the President on the pardon applications that the Deputy has determined should be considered by the President. See id. § 1.6(c).
The Pardon Attorney, therefore, does not, as a matter of his working relationships, directly advise the President on pardon recommendations or serve as immediate staff to the White House Counsel or other key White House advisers in the Office of the President. In practice, the Deputy Attorney General acts as an intermediate controlling official who exercises independent judgment on which pardon applications and what recommendations to submit for the President’s consideration. Cf. Ryan, 617 F.2d at 786. These internal working relationships are part of the “regular business” of the Department. See id. at 787. The fact that the Deputy Attorney General’s recommendations for the President are transmitted to the Office of the White House Counsel through the Pardon Attorney does not minimize the significance for FOIA purposes of the Department’s intermediary role in preparing pardon recommendations for the President. This role contrasts with that of the key White House advisers in the Office of the President who directly advise the President as was discussed in In re Sealed Case, 121 F.3d at 752. The White House Counsel, in the Office of the President, who enjoys close proximity to the President, is one such key adviser; the Pardon Attorney, in the Justice Department, who is at least twice removed from the President, is not.
Nor can the Deputy Attorney General or Attorney General be equated with the close presidential advisers discussed in In re Sealed Case. Since the creation of the Department in 1870, the Attorney General has not only served as an adviser to the President, but also as the administrator of the Department. See Ryan, 617 F.2d at 787. Recognizing the problem of “dual-hat” advisers who perform other functions in addition to advising the President, see Armstrong v. Executive Office of the President, 90 F.3d 553, 558 (D.C.Cir.1996), the court in Ryan noted that the Attorney General, as head of the Justice Department, could not be treated as a non-agency exempt from the FOIA when he was engaged in his presidential advisory functions. Ryan, 617 F.2d at 788. In In re Sealed Case, the court’s reference to “ ‘dual hat’ presidential advisers,” was limited to those “immediate White House adviser’s staff’ who “exercise substantial independent authority or perform other *1121 functions in addition to advising the President,” 121 F.3d at 752, and for these individuals, the presidential communications privilege could apply if the government bore its burden of proving that their communications occurred in the course of advising the President. See id. But, the court in Ryan rejected the notion that the Attorney General should be treated as “the President’s immediate personal staff,” or as a unit within the Executive Office of the President “whose sole function is to advise the President.”. Id. at 788. Cf. Soucie, 448 F.2d at 1075. Extension of the presidential communications privilege to the Attorney General’s delegatee, the Deputy Attorney General, and his staff, on down to the Pardon Attorney and his staff, with the attendant implication for expansion to other Cabinet officers and their staffs, would, as the court pointed out in In re Sealed Case, “pose a significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President.” Id.
Instead, consistent with the Department’s historical position and the underlying public interest, its internal documents that are not “solicited and received” by the President or the Office of the President should be evaluated under the deliberative process privilege. Heretofore, in complying with FOIA requests, the Pardon Attorney has withheld documents that he or she considered privileged under the deliberative process privilege, not the presidential communications privilege. For instance, in Binion v. United States Dep’t of Justice, 695 F.2d 1189, 1191 (9th Cir.1983), when an applicant for a Presidential pardon sought disclosure under FOIA of all records dealing with his prior pardon applications, the Pardon Attorney relied only on Exemption 5’s deliberative process privilege, Exemption 7’s privilege for law enforcement records, and the Privacy Act’s “general exemption” for rap sheets and other criminal reports, to justify withholding the documents. See also Crooker, 614 F.2d at 828. Indeed, the declaration of Deputy Attorney General Larry D. Thompson states that “the documents withheld in this litigation ... are properly subject to the deliberative' process privilege,” evidencing an expectation that working documents, produced in the course of developing the Deputy Attorney General’s recommendations for the President, would be evaluated only under the deliberative process privilege, not the presidential communications privilege. The ultimate goal of protecting the confidentiality of the President’s decision-making and his access to candid advice is achieved under the deliberative process privilege for those working documents that never make their way to the Office of the President. Inasmuch as disclosure of factual information may reveal the nature and substance of the issues before the President, factual information is protected against disclosure under the deliberative process privilege “if it is inextricably intertwined with policy-making processes.” Soucie, 448 F.2d at 1077-78.
Consequently, to define the scope of the presidential communications privilege functionally by focusing on the “sole” responsibility of the Pardon Attorney to advise the President on his pardon duty, ignores the internal working relationships of the Pardon Attorney within the Justice Department and the fact that it is the Deputy Attorney General who makes the final decision on the pardon recommendations to be submitted for the President’s consideration. While a functional approach has the virtue of simplicity, it comes at too high a price: Any document that in any way pertains to pardons would be covered by the presidential communications privilege regardless of whether it is submitted with the Deputy Attorney General’s pardon recommendations for the *1122 President. To hold that all work performed in connection with a standing request by the President for the Attorney General’s pardon recommendations falls under the presidential communications privilege entails fundamental conceptual difficulties. First, such an interpretation would sweep within the reach of the presidential privilege much of the functions of the executive branch, namely, to advise the President dn the performance of his Article II duties. Courts have long been hesitant to extend the.presidential communications privilege so far, for ours is a democratic form of government where the public’s right to know how its government is conducting its business has long been an enduring and cherished value. See In re Sealed Case, 121 F.3d at 749 (quoting Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 WRITINGS op JaMes Madison 103 (Gaillard Hunt, ed.1910)). See also Mink, 410 U.S. at 105, 93 S.Ct. at 844 (Douglas, J., dissenting) (quoting Henry Steels Commager, The New York Review of Books, Oct. 5, 1972, p. 7). As we cautioned in In re Sealed Case, the courts must be “ever mindful of the dangers [of] cloaking governmental operations in secrecy.” 121 F.3d at 762. Second, extending the presidential communications privilege to working documents produced in the course of- advising the President on his pardon power would be inconsistent with the Department’s historical approach of invoking the deliberative process privilege rather than the presidential communications privilege to protect its internal documents and deliberations from public disclosure. The Department has not argued, much less proffered any evidence, that the President’s decision-making process on pardons has been compromised in any manner as a result of the Department’s prior reliance on the deliberative process privilege.
Our dissenting colleague reaches a different conclusion, namely, that any and all documents originated for the sole purpose of advising the President on a “quintessential and nondelegable” power must be protected by the presidential communications privilege, irrespective of whether they are received by the President or any of his close White House advisers. Dissenting Op. at 1137. The dissent points to the In re Sealed Case court’s statement that the privilege protects “pre-decisional” documents produced in the course of advising the President, not just those documents that physically enter the Oval Office. 121 F.3d at 750. See Dissenting Op. at 1137-38. However, application of this statement to the pardon documents at issue is problematic for several reasons. The In re Sealed Case court extended the presidential communications privilege beyond communications actually seen by the President to the working papers of the President’s immediate White House advisers in the Office of the President, not simply because the documents were “originated for the sole purpose of advising the President,” Dissenting Op. at 1137, but because there was reason to believe, given the decision-making process at issue, that the President’s confidentiality and access to candid advice might otherwise suffer. That concern is far more attenuated for working documents of an agency that were never submitted to the Office of the President. The dissent’s point seems to be that with regard to nondelegable presidential duties, no matter how many steps a communication is removed from the President, if it is protected only by the deliberative process privilege and not by the presidential communications privilege, it risks exposing the “issues before the President,” thus compromising his interest in confidentiality. Dissenting Op. at 1139. But this approach fails to acknowledge both “the general rule, underscored by the Supreme Court in Nixon [I], that privileges should be narrowly construed,” In re Sealed Case, 121 *1123 F.3d at 749, and the significance of the hierarchy of presidential advisers underlying the analysis in In re Sealed Case, 121 F.3d at 752. Whereas the In re Sealed Case court recognized that the need for the presidential communications privilege becomes more attenuated the further away the advisers are from the President, the dissent fails to acknowledge that the “organizational chart” affects the extent to which the contents of the President’s communications can be inferred from predeci-sional communications.
The reality is that working papers of an immediate White House adviser in the Office of the President will be far more revelatory of advice given to the President than internal Department documents such as emails within the Department “transmitting information on particular pardons, and requesting information, such as warrants and background investigations.”- See Vaughn Index category No. 7. The less one can learn from these twice- and thrice-removed communications about “the evolution of advisers’ positions and as to the different policy options considered along the way,” Dissenting Op. at 1137, the less need is there to protect them under the presidential communications privilege. Although the court acknowledged in In re Sealed Case that the deliberative process privilege would be inadequate to protect the President’s confidentiality and the candor of his immediate White House advisers, 121 F.3d at 750, the court nevertheless concluded that the presidential communications privilege should not extend outside of the White House into executive branch agencies. See id. at 752. For, to the extent those concerns remain with regard to internal agency communications, the deliberative process privilege protects confidential intra- and inter-agency communications consisting of recommendations or opinions that are advisory or deliberative in nature as well as communications revelatory of the President’s decision-making process. See Soucie, 448 F.2d at 1077-78. See also Mink, 410 U.S. at 86, 89, 93 S.Ct. at 835, 836. The dissent’s further argument that the President could have organized the pardon process to bring more pre-decisional communications within the scope of the presidential communications privilege, see Dissenting Op. at 1138; cf. Ass’n. of Am. Physicians & Surgeons, Inc. v. Clinton, 997 F.2d 898, 910 (D.C.Cir.1993), is irrelevant. The President has not done so, and the organizational structure of presidential decision-making matters in determining the scope of the presidential communications privilege because it speaks to the strength of the President’s confidentiality interests in a particular communication. In the FOIA context, moreover, the court has long recognized that the way in which the President organizes and delegates his official duties is significant. See Ryan, 617 F.2d at 789. Finally, the dissent’s qualification that the protection of the presidential communications privilege would attach only if the advice is on a “quintessential and nondele-gable Presidential power,” Dissenting Op. at 1137, draws an arbitrary line, for it provides no reason to conclude that presidential decisions that could have been delegated, but were not, are entitled to less candid or confidential advice than those that could not have been delegated at all.
Accordingly, we hold that the presidential communications privilege applies to pardon documents “solicited and received” by the President or his immediate advisers in the Office of the President, and that the deliberative process privilege applies to internal agency documents that never make their way to the Office of the President. This approach heeds the teachings of Nixon I and II and In re Sealed Case, and strikes an appropriate balance between the President’s need for confidentiality and frank advice and the obligations of open *1124 government. As is demonstrated by the Department’s historical reliance on the deliberative process privilege, the public interest in protecting the President’s decision-making process is. preserved without extending the presidential communications privilege to internal Department documents that do not accompany the Deputy Attorney General’s pardon recommendations for the President and are not otherwise solicited and received by the Office of the President. Although the Supreme Court has pointed out that the “expectation of the confidentiality of executive communications [] has always been limited and subject to erosion over time after an administration leaves office,” Nixon II, 433 U.S. at 451, 97 S.Ct. at 2793, the Department does not suggest that a lesser interest in confidentiality is called for because the requested documents are those" of a former Administration.
As noted, the Vaughn index indicates that certain documents requested by Judicial Watch are not covered by the presidential communications privilege. Internal documents between the Office of the Pardon Attorney and the Deputy Attorney General’s staff or communications within the Deputy Attorney General’s office, that were not sent to the Office of the President, appear to be more appropriately examined under the deliberative process privilege. See, e.g., Vaughn Index category Nos. 1, 2, 4, 10, 11, 13, 14, 19, 20, 21, 22, 25, 27-30. We therefore reverse that part of the grant of summary judgment extending the presidential communications privilege to the Department’s internal documents. With regard to other categories of documents, however, it is difficult to determine whether or not all or some of the documents were forwarded to the Office of the President. See, e.g., Vaughn index Category 12 (letters among the Office of the Pardon Attorney, United States Attorney’s Offices, and the White House). On remand, the district court should review those documents and determine whether they fall within the presidential communications privilege. For those documents not protected by the presidential communications privilege, the district court should determine whether they were properly withheld under FOIA Exemption 5’s deliberative process privilege or under FOIA Exemption 6, giving due consideration to Judicial Watch’s claim that the balance of interests weighs in favor of releasing the records and to the agency’s obligation, pursuant to 5 U.S.C. § 552(b), to disclose all reasonably segregable, nonexempt portions of the documents.
III.
FOIA Exemption 6 allows the government to withhold documents about individuals in “personnel and medical and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.” 5 U.S.C. § 552(b)(6). Its primary purpose is to “protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.” United States Dep’t of State v. Washington Post Co., 456 U.S. 595, 599, 102 S.Ct. 1957, 1960, 72 L.Ed.2d 358 (1982). The reference to “similar files” has been interpreted broadly to include those “detailed Government records on an individual which can be identified as applying to that individual.” Id. at 602, 102 S.Ct. at 1962 (quoting H.R.Rep. No. 1497, U.S.Code Cong. & Admin.News 1966, p. 2428). The Supreme Court has long rejected a “cramped notion of personal privacy.” United States Dep’t of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 763, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1989).
The district court ruled that the release of non-public, personal information regarding the pardon applicants, their families, and the crimes they committed, *1125 could reasonably be interpreted as invasions of personal privacy, and that there was no indication that the disclosure of such information would contribute significantly to the public’s understanding of the government’s activities. See Judicial Watch, Inc. v. United States Dep’t of Justice, 259 F.Supp.2d 86, 91-92 (D.D.C.2003). On appeal, Judicial Watch contends that Exemption 6 is inapplicable, first, because pardon applications do not concern personal information about prisoners but rather, the basis upon which their clemency was granted, and second, because convicted felons are not entitled to the same privacy rights as other citizens. These contentions are without merit.
In Reporters Comm., the. Supreme Court held that the disclosure of contents of FBI rap sheets constituted an unwarranted invasion of personal privacy, and thus were exempt from disclosure. Although the case involved FOIA Exemption 7(c) rather than Exemption 6, the Court’s reasoning is instructive. This court has deemed the privacy inquiry of Exemptions 6 and 7(c) to be essentially the same, see Reed v. NLRB, 927 F.2d 1249, 1251 (D.C.Cir.1991); Nat’l Ass’n of Retired Fed. Employees v. Horner, 879 F.2d 873, 874 (D.C.Cir.1989), although the Supreme Court has recently construed Exemption 7(c) to be broader. See Nat’l Archives & Records Admin. v. Favish, — U.S. -, at -, 124 S.Ct. 1570, at 1577, 158 L.Ed.2d 319 (2004). In Reporters Comm., the Supreme Court described privacy as an “individual interest in avoiding disclosure of personal matters.... [encompassing] the individual’s control of information concerning his or her person.” 489 U.S. at 762-63, 109 S.Ct. at 1476. The Court stated that although much of the content of FBI rap sheets were a matter of public record, id. at 753, 109 S.Ct. at 1471, the limited availability of an actual rap sheet to the public reflected a recognition of the privacy interests of criminals, for there was a distinction, in the court’s view, of “scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole.” Id. at 764, 109 S.Ct. at 1476. Thus, the Court not only recognized that criminals have privacy interests, but also that the availability of the public information contained in rap sheets, when compiled as one document, implicated privacy interests.
The documents withheld by the Department under Exemption 6 consist primarily of individual petitions for pardons, including non-public personal information about the applicants and their lives before and after their convictions and personal information about third parties. The pardon application calls for a broad range of detailed and highly personal information about a pardon applicant. In addition to the usual identifying information such as name, home address, social security number, citizenship,, and physical characteristics, the form asks the applicant to provide a detailed account of his or her criminal history, substance abuse, occupational licensing history, and such personal biographical matters as family history, marital status, and the names, birth dates, custody, and location of the applicant’s children. Information must also be provided on residences, employment history, military record, financial status, and medical history. Applicants generally also include a description of their lives since conviction, their mental and physical well-being, and emotional pleas for pardons, including letters from friends, family members, employers, and attorneys.
These documents easily fall under the purview of .an individual’s “interest in avoiding. disclosure of personal matters,” and controlling “information concerning his or her person.” Reporters Comm., 489 U.S. at 762-63, 109 S.Ct. at 1476. The *1126 disclosure of the documents Judicial Watch requests would implicate far more serious privacy interests than those at stake in Reporters Comm. Even though some of this information has previously been disclosed to the public, under the reasoning of Reporters Comm., the information is nevertheless entitled to protection. See id. at 764, 109 S.Ct. at 1476. Judicial Watch’s reliance on such cases as United States v. Amen, 831 F.2d 373 (2nd Cir.1987), for the proposition that pardon applicants do not have the same privacy interests as law-abiding citizens, is misplaced. Amen involved a Fourth Amendment claim where the Second Circuit held that prison inmates have no reasonable expectation of privacy — i.e., they are subject to strip searches, random cell searches, and monitoring of their telephone conversations. 831 F.2d at 379-80 (citations omitted). It does not follow that pardon applicants, who are not necessarily still in custody, do not have a privacy interest in documents containing sensitive personal information. See also Smith v. Fairman, 678 F.2d 52, 54 (7th Cir.1982). Furthermore, these types of personal records are unlikely to shed light on the Department’s conduct in the pardoning process. See Reporters’ Comm., 489 U.S. at 773, 109 S.Ct. at 1481. The operative inquiry in determining whether disclosure of a document implicating privacy issues is warranted is the nature of the requested document itself, not the purpose for which the document is being requested. See id. at 772, 109 S.Ct. at 1480. Accordingly, we affirm the grant of summary judgment for documents withheld pursuant to Exemption 6, for the district court correctly ruled that their disclosure would constitute “a clearly unwarranted invasion of personal privacy,” 5 U.S.C. § 552(b)(6), that outweighs any public interest that Judicial Watch may claim in their disclosure.
IV.
Under FOIA, the Department is permitted to charge a reasonable fee for searching, copying, and reviewing its files. See 5 U.S.C. § 552(a)(4)(A)(ii). Fees are to be reduced or waived if disclosure of the requested information is “in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester.” Id. § 552(a)(4)(A)(iii). For a request to be in the “public interest,” four criteria must be satisfied: (1) the request must concern the operations or activities of government; (2) the disclosure must be “likely to contribute” to an understanding of government operations or activities; (3) disclosure must contribute to an understanding of the subject by the public at large; and (4) disclosure must be likely to contribute significantly to such public understanding. See 28 C.F.R. § 16.11(k)(2). The Department’s regulations also provide that, “The disclosure of information that already is in the public domain, in either a duplicative or a substantially identical form, would not be as likely to contribute to such [public] understanding where nothing new would be added to the public’s understanding.” Id. § 16.11(k)(2)(ii). The burden of satisfying the public interest standard is on the requestor. See Larson v. CIA 843 F.2d 1481, 1483 (D.C.Cir.1988). However, proof of the ability to disseminate the released information to a broad cross-section of the public is not required. See Carney v. United States Dep’t of Justice, 19 F.3d 807, 814 (2d Cir.1994).
In response to Judicial Watch’s requests for a blanket waiver of FOIA processing fees under 5 U.S.C. § 552(a)(4)(A)(iii), the Department, in moving for summary judgment, argued that Judicial Watch was seeking information that was already in the public domain and thus not likely to *1127 contribute significantly to the public’s understanding of the pardon process. After initially denying the Department’s motion on the ground that Judicial Watch did not have access to any of the documents and could not determine whether they were publicly available, the court, upon reconsideration, granted summary judgment to the Department based upon its subsequent release of more than 15 percent of the total pages of the non-exempt documents and a supplemental Department affidavit averring that additional non-exempt pardon documents were also in the public domain. On appeal, Judicial Watch contends that it has met all four of the Department’s criteria for qualifying for a fee waiver, see 28 C.F.R. § 16.11 (k)(2)(i-iv), but has been placed in a “catch-22” situation by being asked to identify the documents that would most likely contribute to the public’s understanding of the pardon process before it has access to any of the documents.
Despite receipt of thousands of pages of requested documents, Judicial Watch has made no showing that these documents were not publicly available. Absent some indication of why it was not reasonable for the district court to have relied on the documents already released by the Department and its supplemental declaration as to the remaining non-exempt documents, there is no basis to conclude that Judicial Watch is entitled to a blanket waiver of FOIA processing fees. See Larson, 843 F.2d at 1483. Under Department regulations, when the costs of an anticipated duplication is determined to be in excess of $250, the Department may “require the requester to make an advance payment of an amount up to the amount of the entire anticipated fee” prior to producing any of the documents to the requester. See 28 C.F.R. § 16.11(i)(2). Further, if advance payment or a good faith commitment to pay the anticipated duplication fees is not provided, the regulations provide that “the request shall not be considered received and further work will not be done on it until the required payment is received.” Id. § 16.11(i)(4). Hence, the Department properly refused to process further documents without payment of the required fees.
At the same time, Judicial Watch cannot be expected to show that the unreleased documents are not, in fact, publicly available. The Department acknowledges as much on appeal. While continuing to maintain that Judicial Watch is not entitled to a blanket fee waiver, the Department states in its brief that some documents sought by Judicial Watch may qualify for a waiver of fees, and that the Pardon Attorney will grant fee waivers for those particular documents. See Appellee’s Brief at 43. In light of this acknowledgment, Judicial Watch has obtained the only relief to which it is entitled under the regulations. See 5 U.S.C. § 552(a)(4)(A)(iii); 28 C.F.R. § 16.11 (k) (2) (I-iv).
Accordingly, we reverse, in part, the grant of summary judgment to the Department based on application of the presidential communications privilege to the internal documents of the Department withheld pursuant to Exemption 5, and otherwise affirm the grant of summary judgment to the Department on documents withheld pursuant to Exemption 6 and Judicial Watch’s request for a blanket waiver of the FOIA processing fees.
*1128 APPENDIX
*1129 [[Image here]]
*1130 [[Image here]]
*1131 [[Image here]]
*1132 [[Image here]]
*1133 [[Image here]]
*1134 [[Image here]]
*1135 [[Image here]]
*1136 [[Image here]]

. The Office of the President, as relevant.to the issues in this appeal, is distinct from the Executive Office of the President and is a smaller unit comprised of such immediate advisers as the Chief of Staff and the White *1110 House Counsel. See Congressional Quarterly, Federal Staff Directory vii (44th ed.2004); Nat'l Archives & Records Admin,, Office of the Fed, Register, The United States Gov't Manual 88-89 (2003). Although the Executive Office of the President is an agency subject to the FOIA, see 5 U.S.C. § 552(f)(1), the Office of the President is not. See Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 156, 100 S.Ct. 960, 971, 63 L.Ed.2d 267 (1980) (quoting H.R. Conf. Rep. No. 93-1380, p. 15 (1974)). In referring to the President's immediate or key advisers in the Office of the President, we embrace the definitional analysis set forth in In re Sealed Case, 121 F.3d at 749-50, 752.

. Specifically, Judicial Watch requested, "all correspondence, memoranda, documents, reports, records, statements, audits, lists of names, applications, diskettes, letters, expense logs and receipts, calendar or diary logs, facsimile logs, telephone records, call sheets, tape recordings, video recordings, notes, examinations, opinions, folders, files, books, manuals, pamphlets, forms, drawings, charts, photographs, electronic mail, and other-documents and things, that refer or relate to the following in any way” to pardon grants and applications considered by former President Clinton.

. See Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C.Cir.1973). The Vaughn index is appended to this opinion.

. Although the current rules refer to the "Associate Attorney General,” see 28 C.F.R. §§ 0.35(b), 0.36 (2003), the declarations, which were filed in 2002, refer to the delegation of the Attorney General's pardon duties to the Deputy Attorney General.