# Authority of Agency Officials to Prohibit Employees From Providing Information to Congress

Consistent with longstanding Executive Branch positions, Department of Health and Human Services officials have the authority to prohibit officers or employees of the Department from providing information to Congress.

May 21, 2004

LETTER OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF HEALTH AND HUMAN SERVICES

This letter replies to your request for our response to a memorandum recently issued by the Congressional Research Service. *See* Memorandum for Honorable Charles Rangel, House Committee on Ways and Means, from Jack Maskell, Legislative Attorney, American Law Division, Congressional Research Service, *Re: Agency Prohibiting a Federal Officer from Providing Accurate Cost Information to the United States Congress* (Apr. 26, 2004) ("CRS Memo"). The CRS Memo concludes that senior administrators within the Department of Health and Human Services ("HHS") "do not have the right to prevent or prohibit their officers or employees, either individually or in association, from presenting information to the United States Congress, its Members or committees, concerning relevant public policy issues." *Id.* at CRS-1 to CRS-2. We believe, consistent with longstanding Executive Branch legal positions, that HHS officials do indeed have such authority.

The CRS position is based principally on the Lloyd–LaFollette Act, 5 U.S.C. § 7211 (2000), and the appropriations riders currently enacted as sections 618 and 620 of the Transportation, Treasury, and Independent Agencies Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 279, 354, 355. CRS interprets these statutes to establish "that a federal employee has the right to communicate with and to provide information to the United States Congress, or to a Member or committee of Congress, and that such right may not be interfered with or impeded." CRS Memo at CRS-3. CRS insists that "[t]here are no countervailing 'separations [sic] of powers' indications generally, nor legitimate 'executive privilege' claims specifically, to justify in this matter the withholding from the United States Congress [of] relevant public policy information by an executive branch officer in a federal agency or department lower down in the chain of command from the President." *Id.* at CRS-2. There are two fundamental errors in the CRS analysis: (1) its summary dismissal of separation of powers concerns and (2) its incorrectly narrow view of the scope of executive privilege.[1]

---

[1] CRS also discusses whether the Chief Actuary has a statutory responsibility to provide cost estimates and other assistance to Congress. *See* CRS Memo at CRS-6 to CRS-7. That question is

## I.

There are serious separation of powers considerations that bear directly on the proper interpretation of the statutes relied upon by CRS. The longstanding Executive Branch position is decidedly contrary to the CRS view. The Executive Branch position was perhaps most succinctly summarized in the Statement of Administration Policy ("SAP") that the Clinton Administration issued on March 9, 1998. The SAP stated that the Administration had determined that S. 1668, a bill purporting to direct the President to inform employees in the intelligence community that they had a right to disclose classified information to Congress without authorization, was an unconstitutional violation of separation of powers principles and, if presented to the President, would be the subject of a veto recommendation from his senior advisors. The SAP went on to say that:

> This provision is clearly contrary to the Supreme Court's explicit recognition of the President's constitutional authority to protect national security and other privileged information. Congress may not vest lower-ranking personnel in the Executive branch with a "right" to furnish national security or other privileged information to a member of Congress without receiving official authorization to do so. By seeking to divest the President of his authority over the disclosure of such information, S. 1668 would unconstitutionally infringe upon the President's constitutional authority.

This position was more fully articulated in Office of Legal Counsel testimony. *See Whistleblower Protections for Classified Disclosures,* 22 Op. O.L.C. 92 (1998) ("Moss Testimony").

The Clinton Administration SAP and the Moss Testimony relied on longstanding Department of Justice positions developed in connection with the statutory provisions on which CRS relies. Those positions were articulated in a brief the Solicitor General filed in the Supreme Court in 1989 in *Am. Foreign Serv. Ass'n v. Garfinkel*, 488 U.S. 923 (1988) (No. 87-2127). That brief was cited in the Moss Testimony, 22 Op. O.L.C. at 92 n.1, and summarized in a 1996 OLC opinion, *Access to Classified Information*, 20 Op. O.L.C. 402, 402–05 (1996). The 1989 Solicitor General brief and the 1996 OLC opinion explained why, under separation of powers principles, Congress may not bypass the procedures the President establishes to authorize the disclosure to Congress of classified and other privileged information by vesting lower-level employees with a right to disclose such information to Congress without authorization. Accordingly, the Department ad–

---

addressed in the legal opinion provided to the Office of the HHS Inspector General by HHS's Office of General Counsel on May 12, 2004.

vised that it would not interpret the statutes cited by CRS here as vesting such a right in Executive Branch employees. *Id.* at 404–05.

The position presented in the Clinton Administration SAP (see reference to "other privileged information") and the Moss Testimony, 22 Op. O.L.C. at 101 n.34, was not limited to classified information, but extended to all deliberative process or other information protected by executive privilege. Because these statutes may not override the constitutional doctrine of executive privilege, they may not act to prohibit the supervision of the disclosure of any privileged information, be it classified, deliberative process or other privileged material. *See* Memorandum for Peter J. Wallison, Counsel to the President, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, at 3 n.6 (Sept. 8, 1986) ("Consistent with our view that Congress cannot override executive privilege by statutory enactment, we do not believe the 'whistleblower' provisions allow an employee to escape sanctions for disclosure of material covered by executive privilege."). *See also* Memorandum for Robert M. McNamara, Jr., General Counsel, Central Intelligence Agency, from Todd D. Peterson, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Legal Authority to Withhold Information from Congress* at 3 (Sept. 9, 1998) ("application of [statutory] reporting requirements . . . is limited by a constitutional restraint—the executive branch's authority to control the disclosure of information when necessary to preserve the Executive's ability to perform its constitutional responsibilities").

The foregoing discussion does not mean that an agency's right to supervise its employees' disclosures to Congress is limited to privileged information. The discussion establishes only that the CRS interpretation that the "right of disclosure" statutes prohibit Executive Branch supervision of employee disclosures unconstitutionally limits the ability of the President and his appointees to supervise and control the dissemination of privileged government information. However, the CRS position also unconstitutionally limits the President's ability to supervise and control the work of subordinate officers and employees of the Executive Branch more generally. *See Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 633 (1982) (statutory "requirement that subordinate officials within the Executive Branch submit reports directly to Congress, without any prior review by their superiors, would greatly impair the right of the President to exercise his constitutionally based right to control the Executive Branch"; provision would be unconstitutional if so construed); *Authority of the Special Counsel of the Merit Systems Protection Board to Litigate and Submit Legislation to Congress*, 8 Op. O.L.C. 30, 31 (1984) ("Congress may not grant [Special Counsel] the authority to submit legislative proposals directly to Congress without prior review and clearance by the President, or other appropriate authority, without raising serious separation of powers concerns").

This second, "unitary Executive" position is based on the following rationale:

> The [judicial] decisions and the long practical history concerning the right of the President to protect his control over the Executive Branch are based on the fundamental principle that the President's relationship with his subordinates must be free from certain types of interference from the coordinate branches of government in order to permit the President effectively to carry out his constitutionally assigned responsibilities. The executive power resides in the President, and he is obligated to "take care that the laws are faithfully executed." In order to fulfill those responsibilities, the President must be able to rely upon the faithful service of subordinate officials. To the extent that Congress or the courts interfere with the President's right to control or receive effective service from his subordinates within the Executive Branch, those other branches limit the ability of the President to perform his constitutional function.

6 Op. O.L.C. at 638-39. Based on this rationale, we do not believe that the statutes relied upon by CRS could constitutionally be applied, as CRS would apply them, to the circumstance where a government official instructs a subordinate government employee not to provide an administration's cost estimates to Congress, whether or not the estimates are viewed as privileged.[2]

## II.

CRS's dismissal of any separation of powers concerns with its reading of the "right of disclosure" statutes is exacerbated by its much too narrow view of the scope of executive privilege. CRS cites *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), for the proposition that "executive privilege does 'not extend to staff outside the White House in executive branch agencies,' covering only those with 'operational proximity' to the President." CRS Memo at CRS-2 n.7. This mischaracterizes *Sealed Case*, a case addressing the scope of the presidential communications component of executive privilege, as a case defining the overall scope of executive privilege. To the contrary, the holdings of *Sealed Case* were limited to the presidential communications privilege, and not only did the court not seek to define the scope of other components of executive privilege, but it also explicitly identified another component of executive privilege, the deliberative process privilege, which is the component applicable in the HHS actuarial-estimates context that occasioned the CRS Memo. *See Sealed Case*, 121 F.3d at 737 ("The most frequent form of executive privilege raised in the judicial arena is the deliberative process privilege"). The court contrasted the two privileges, indicating that "one applies to decisionmaking of executive officials generally, the other

---

[2] As discussed in the HHS legal opinion, the Chief Actuary is not "independent" for purposes of presidential or HHS supervision over the disclosure of HHS records or information to Congress.

specifically to decisionmaking of the President." *Id.* at 745.[3] *See also Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 1109 (D.C. Cir. 2004) (referring to the deliberative process and presidential communications privileges as "two privileges falling within [the executive privilege] doctrine"); *id.* at 1113–14 ("the deliberative process privilege . . . is a general privilege that applies to all executive branch officials").

This principle that the deliberative process component of executive privilege applies government-wide, and is not limited to presidential decisionmaking, was also recognized implicitly in the leading Supreme Court decision on executive privilege, *United States v. Nixon*, 418 U.S. 683, 705 (1974) (recognizing "the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties"), and it has been the basis for numerous executive privilege assertions in the last 50 years concerning intra-agency deliberations, including deliberations involving lower-level agency officials. The history of those assertions as of 1991 is chronicled in a Department of Justice letter, which also chronicles Department of Justice legal positions. *See* Letter to Honorable Howard M. Metzenbaum, United States Senate, from W. Lee Rawls, Assistant Attorney General, Office of Legislative Affairs (July 1, 1991). Subsequent to that letter, Presidents George Bush, Bill Clinton and George W. Bush each asserted executive privilege against congressional committees to protect intra-agency deliberative materials prepared for senior officers in executive departments below the President.[4]

JACK L. GOLDSMITH III
*Assistant Attorney General*
*Office of Legal Counsel*

---

[3] The court noted in *Sealed Case* that executive privilege claims in the congressional context historically have generally concerned deliberative process privilege rather than presidential communications privilege. *See id.* at 739 ("Presidential claims of a right to preserve the confidentiality of information and documents figured more prominently in executive-congressional relations, but these claims too were most often essentially assertions of the deliberative process privilege.").

[4] Although we cannot opine on the privileged status of particular documents without reviewing the documents themselves, we can say that the estimates an administration develops for its internal use in considering policy options should generally be considered privileged because they reflect the deliberative process.