# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2012-NMSC-026**

**Filing Date: June 28, 2012**

**Docket No. 32,524**

**REPUBLICAN PARTY OF NEW MEXICO and LYN OTT,
individually and in her capacity as Help America Vote Act (HAVA)
Director for the Republican Party of New Mexico,**

> **Plaintiffs-Petitioners,**

**v.**

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT,
MOTOR VEHICLE DIVISION and LUIS CARRASCO, custodian
of records for the New Mexico Taxation and Revenue Department,
Motor Vehicle Division,**

> **Defendants-Respondents.**

**ORIGINAL PROCEEDING ON CERTIORARI**
**Valerie A. Mackie Huling and Nan G. Nash, District Judge**s

Bowles and Crow
Jason Bowles
B.J. Crow
Albuquerque, NM

Peifer, Hanson & Mullins, P.A.
Charles R. Peifer
Lauren Keefe
Albuquerque, NM

for Petitioners
Long, Pound & Komer, P.A.
John B. Pound
Mark T. Baker
Jennifer A. Attrep
Santa Fe, NM

Jessica M. Hernandez

General Counsel for the Office of the Governor
Santa Fe, NM

for Respondents

Luebben Johnson & Barnhouse, L.L.P.
Dolph Barnhouse
Los Ranchos de Albuquerque, NM

for Amicus Curiae New Mexico Foundation for Open Government

**OPINION**

**SERNA, Justice.**

**{1}**     "All political power is vested in and derived from the people: all government of right originates with the people, is founded upon their will and is instituted solely for their good." N.M. Const. art. II, § 2.  The co-equal branches of the government of the State of New Mexico, N.M. Const. art. III, § 1, like those of the United States of America, are expressly limited to the exercise of powers delegated to them by our citizens.  Our democratic system of government necessarily "assumes the existence of an informed citizenry. . . .  Without some protection for the acquisition of information about the operation of public institutions . . . the process of self-governance contemplated by the Framers would be stripped of its substance." *Houchins v. KQED, Inc.*, 438 U.S. 1, 31-32 (1978) (Stevens, J., dissenting).  To give practical effect to this principle, our Legislature enacted the Inspection of Public Records Act, NMSA 1978, §§ 14-2-1 to -12 (1947, as amended through 2011) (IPRA).  "Recognizing that a representative government is dependent upon an informed electorate," the Legislature declared "that all persons are entitled to the greatest possible information regarding the affairs of government."  *Id.* § 14-2-5.

**{2}**     Although the public's right to access information concerning the inner workings of its government is considerable, it is not without limit.  Under the New Mexico Constitution, the people delegate certain duties to elected officials, particularly the Governor, in whom is vested the "supreme executive power of the state."  N.M. Const. art. V, § 4.  Our constitution and laws recognize that under certain circumstances the Governor is entitled to a limited degree of privilege—that is, protection from public disclosure—in the course of performing his or her duties.

**{3}**     This appeal, our first occasion to consider executive privilege in the context of a public records request, presents a conflict between these two important principles.  Petitioners Republican Party of New Mexico and Lyn Ott, individually and as the Director of the Help America Vote Act for the Republican Party (collectively, Petitioners), requested certain government documents.  Respondents New Mexico Taxation and Revenue Department, Motor Vehicle Division, and Luis Carrasco, Custodian of Records (collectively, Respondents) withheld some of those documents on several grounds, including executive privilege.  While recognition of some form of executive privilege "is required by the

2

Constitution of the State of New Mexico," *State ex rel. Att'y Gen. v. First Judicial Dist. Court*, 96 N.M. 254, 257, 629 P.2d 330, 333 (1981), it falls on this Court to delineate under what circumstances the executive may properly invoke that privilege pursuant to IPRA. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is . . . the province and duty of the judicial department to say what the law is.").

## I.  BACKGROUND

{4}  Petitioner Ott filed an IPRA request with the Motor Vehicles Division (MVD), a division of the Taxation and Revenue Department, after she read an Associated Press article about then-Governor Bill Richardson's executive order directing the MVD to require two forms of identification before issuing a driver's license to any foreign national.  With the stated aim of investigating whether individuals were using New Mexico drivers' licenses to unlawfully register to vote, Ott requested documents relating to the issuance of drivers' licenses to foreign nationals, including documents reflecting the number of such licenses issued, as well as documents relating to an audit of the license program ordered by Governor Richardson.  Respondents complied with the request by mailing Ott 150 pages of material, including emails and spreadsheets, but indicated in an accompanying cover letter that certain information had been redacted pursuant to attorney-client privilege and executive privilege, as well as the federal Driver Privacy Protection Act, 18 U.S.C. §§ 2721-2725 (1994, as amended through 2000) (DPPA) and its state analogue, NMSA 1978, § 66-2-7.1 (2007) (NMDPPA) (collectively, Privacy Acts), which prohibit the disclosure of private information related to drivers' licenses.  Ott appealed directly to the Taxation and Revenue Department, requesting unredacted versions of the documents.  Respondents did not send the requested unredacted documents but provided redacted copies of additional responsive documents.

{5}  Petitioners filed suit in the Second Judicial District Court to compel Respondents to release the documents in unredacted form.  Both parties filed motions for summary judgment. Petitioners asserted that executive privilege was inapplicable, and that disclosure was required under a research exception to the Privacy Acts.[1] Respondents argued that all documents were properly redacted.  The district court consolidated the motions and held a hearing on the applicability of the Privacy Acts, executive privilege, and attorney-client privilege to the documents at issue.  The district court granted Respondents' motion for summary judgment in part, concluding that private identifying information was properly redacted pursuant to the Privacy Acts.  After conducting an in camera review of the documents redacted on privilege grounds, the district court concluded that both the attorney-client and executive privileges were properly invoked and not overcome by Petitioners' showing of need. Petitioners filed a motion for reconsideration which the district court denied.

---

[1] This Opinion addresses only the existence and scope of executive privilege. Although the parties also briefed and argued the application of the Privacy Acts, for reasons explained below we decline to consider that issue.  That portion of the Court of Appeals' opinion addressing the Privacy Acts, therefore, is not affected by our resolution of this appeal.

**{6}** Petitioners appealed to the Court of Appeals. The Court of Appeals affirmed the district court's grant of summary judgment regarding the Privacy Act redactions. *Republican Party of N.M. v. N.M. Dep't of Tax. & Rev.*, 2010-NMCA-080, ¶¶ 14-16, 148 N.M. 877, 242 P.3d 444. The Court of Appeals determined that the resolution of the appeal would depend on the applicability of the deliberative process privilege, *id.* ¶ 32, which the court characterized as "protect[ing] the government's decision-making process," *id.* ¶ 34. The court then concluded that the deliberative process privilege shielded the documents at issue from disclosure. *Id.* ¶¶ 34-36. The court also held that Respondents properly invoked attorney-client privilege to withhold certain documents. *Id.* ¶ 40.

**{7}** Petitioners then petitioned this Court for certiorari, which we granted to review Respondents' redactions pursuant to the Privacy Acts and executive privilege. Amicus New Mexico Foundation for Open Government joined Petitioners in requesting that this Court reverse the Court of Appeals' ruling on executive privilege and the Privacy Acts. Petitioners did not seek this Court's review over the Court of Appeals' upholding of redactions made on the basis of attorney-client privilege. Eight documents thus remained at issue, six of which Respondents had redacted pursuant to claims of executive privilege, and two of which they had redacted pursuant to the Privacy Acts. The documents redacted on the grounds of executive privilege included communications regarding New Mexico's negotiations with the Mexican government regarding access to certain identity documents, and discussions related to implementing the audit of the driver's license program. *See Republican Party*, 2010-NMCA-080, ¶ 26.

## II. MOOTNESS

**{8}** Events occurring since this Court granted certiorari require a close look at whether we may exercise jurisdiction over this appeal. *See Smith v. City of Santa Fe*, 2007-NMSC-055, ¶ 10, 142 N.M. 786, 171 P.3d 300 ("[I]t is incumbent upon the appellate court to raise jurisdiction questions sua sponte when the Court notices them."). Shortly after taking office, Governor Susana Martinez issued Executive Order 2011-003, entitled "Limiting the Claim of Executive Privilege to Promote Transparency and Open Government." This order states that executive privilege "can only be invoked with written authorization from the Office of the Governor," and may be invoked to shield from disclosure certain "communications between or among the Governor, a Cabinet Secretary, an agency head or any of their high-level advisors." In addition, subsequent to our grant of certiorari, the parties filed a joint motion to approve a settlement that would permit all documents requested to be transferred to the Secretary of State rather than to Petitioners, and would require this Court to vacate the Court of Appeals' opinion. We denied that motion.

**{9}** At oral argument, the parties stated that they now agreed that executive privilege did not protect the remaining documents from disclosure. Respondents also indicated that the current administration would not have invoked executive privilege in the first instance with respect to the disputed documents. While we acknowledge and commend the efforts of the parties to resolve their dispute, it is for this Court to decide whether the case is moot and whether we retain jurisdiction to issue an opinion.

4

**{10}** "As a general rule, this Court does not decide moot cases." *Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008. When no actual controversy exists for which a ruling by the court will grant relief, an appeal is moot and ordinarily should be dismissed. *Id.* In New Mexico, however, courts recognize two exceptions to the prohibition on deciding moot cases: cases which present issues of substantial public interest, and cases "which are capable of repetition yet evade review." *Id.* ¶ 10. A case presents an issue of substantial public interest if it involves a constitutional question or affects a fundamental right such as voting. *See Garcia v. Dorsey*, 2006-NMSC-052, ¶ 17, 140 N.M. 746, 149 P.3d 62 (procedural due process); *Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶¶ 24-28, 140 N.M. 77, 140 P.3d 498 (Election Code); *Gunaji*, 2001-NMSC-028, ¶ 10 (election contest); *Mowrer v. Rusk*, 95 N.M. 48, 52, 618 P.2d 886, 890 (1980) (separation of powers); *see also State ex rel. Newsome v. Alarid*, 90 N.M. 790, 793, 568 P.2d 1236, 1239 (1977) (describing "the right to inspect public documents" as an issue of public importance). An issue is "capable of repetition" yet evading review if the issue is likely to arise in a future lawsuit, regardless of the identity of the parties. *Gunaji*, 2001-NMSC-028, ¶ 11; *see also Cobb*, 2006-NMSC-034, ¶¶ 29-32 (time frame of election); *Howell v. Heim*, 118 N.M. 500, 503, 882 P.2d 541, 544 (1994) (budget crisis). The Court's review of moot cases that either raise an issue of substantial public interest or are capable of repetition yet evading review is discretionary. *See Cobb*, 2006-NMSC-034, ¶ 14 (noting that the Court "may review moot cases" that fall within either of the two exceptions).

**{11}** While this case is arguably moot, as the Secretary of State has by now received from the MVD at least a portion of the documents sought by Petitioners and has undertaken the task Petitioners had asserted they were intending to perform upon receipt of those documents, the substantial public interest exception to the mootness doctrine compels the issuance of an opinion in this appeal. We conclude that the scope of the Governor's executive privilege is an issue of substantial public interest and therefore address the issue de novo, even though the documents that originally gave rise to the lawsuit underlying this appeal are no longer in dispute. *See Mowrer*, 95 N.M. at 52, 618 P.2d at 890 ("The parameters of the separation of powers doctrine presents a recurring problem of great public interest."); *Pub. Serv. Co. of N.M. v. Lyons*, 2000-NMCA-077, ¶ 10, 129 N.M. 487, 10 P.3d 166 (stating that questions of privilege are reviewed de novo). We will not, however, address the issue of withholding information under the Privacy Acts, as that issue does not here rise to the requisite level of public interest to permit an exception to the mootness doctrine.

## III.    DISCUSSION

### A.    Exceptions to Disclosure Under IPRA

**{12}** Our Legislature enacted IPRA to promote the goal of transparency in our state government:

> Recognizing that a representative government is dependent upon an

5

informed electorate, the intent of the legislature in enacting the Inspection of Public Records Act is to ensure, and it is declared to be the public policy of this state, that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees.

Section 14-2-5. "IPRA is intended to ensure that the public servants of New Mexico remain accountable to the people they serve." *San Juan Agric. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 16, 150 N.M. 64, 257 P.3d 884. "The citizen's right to know is the rule and secrecy is the exception." *Newsome*, 90 N.M. at 797, 568 P.2d at 1243.

**{13}**  Under IPRA, "[e]very person has a right to inspect public records," § 14-2-1(A), by making a request pursuant to the procedures set forth in Section 14-2-8. This right is limited only by the Legislature's enumeration of certain categories of records that are excepted from inspection.  *See* Section 14-2-1(A)(1) to (7) (*inter alia*, attorney-client privileged information, law enforcement records that reveal confidential sources, and governmental emergency response plans).[2]  In addition to the specifically enumerated exceptions, records may be excepted from inspection under IPRA "as otherwise provided by law." *Id.* § 14-2-1(A)(8). This "catch-all" exception includes statutory and regulatory bars to disclosure, such as the Privacy Acts. *See City of Las Cruces v. Pub. Emp. Labor Relations Bd.*, 1996-NMSC-024, 121 N.M. 688, 690-91, 917 P.2d 451, 453-54.  The "catch-all" exception also includes constitutionally mandated privileges, as recognized by the parties and the Court of Appeals, *Republican Party*, 2010-NMCA-080, ¶ 24, as well as privileges established by our rules of evidence, *Estate of Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 7, 139 N.M. 671, 137 P.3d 611; *see also* Rule 11-501 NMRA (limiting privileges that may be asserted to those grounded in the constitution, the rules of evidence, and other rules adopted by the Court). Although courts may use common law principles when interpreting IPRA, *see San Juan Agric. Water Users Ass'n*, 2011-NMSC-011, ¶ 20, this does not mean common law privileges provide a valid basis for withholding documents from public scrutiny when we do not otherwise recognize such privileges in our courts of law or by statute, *see Estate of Romero*, 2006-NMSC-028, ¶ 11; *First Judicial*, 96 N.M. at 257, 629 P.2d at 333.  Without proof of the Legislature's intent to the contrary, we do not construe IPRA to contemplate privileges not applicable elsewhere in our state government.

**{14}**  In order to determine whether an exception not specifically identified in IPRA

---

[2] After the parties submitted briefing and presented oral arguments in this appeal, the Legislature amended IPRA, reducing the number of enumerated exceptions from eleven to seven.  2011 N.M. Laws, ch. 134, § 2.  The Court of Appeals' opinion refers to the "as otherwise provided by law" provision under its former subsection, Section 14-2-1(A)(12). *Republican Party*, 2010-NMCA-080, ¶ 24.  The exceptions removed by the amendment concerned records regarding applicants for university presidencies and certain veterans' discharge papers, and therefore are not relevant to this appeal.

6

shielded the documents at issue from disclosure, the Court of Appeals applied the "rule of reason," *Republican Party*, 2010-NMCA-080, ¶ 24, an approach we introduced in *Newsome*, 90 N.M. at 797, 568 P.2d at 1243; *see also Cox v. N.M. Dep't of Public Safety*, 2010-NMCA-096, ¶ 7, 148 N.M. 934, 242 P.3d 501. The plaintiff in *Newsome* was a reporter for the University of New Mexico *Daily Lobo* who sought access to university personnel records. 90 N.M. at 792, 568 P.2d at 1238. When the university denied him access to some of the records, the plaintiff filed suit under the then-existing version of IPRA, which shielded from disclosure only the first three specific categories of documents exempted today—medical records of institutionalized individuals, certain letters of reference, and documents expressing matters of opinion in personnel or student files—and "as otherwise provided by law." *Id.* at 793-94, 568 P.2d at 1239-40 (citing NMSA 1953, § 71-5-1 (Supp. 1975)). The university withheld some of the disputed records on the basis of enumerated exceptions. *Id.* at 792, 568 P.2d at 1238. Other documents, the university contended, while not specifically exempted from disclosure by IPRA were "of a personal or sensitive nature . . . that, for reasons of public policy, should be kept confidential and not be subject to disclosure." *Id.* at 794, 568 P.2d at 1240. Acknowledging that no New Mexico court at that time had "face[d] this issue squarely," *id.*, *Newsome* reviewed caselaw from other states and concluded that the list of enumerated exceptions to public records disclosure should not be treated as exhaustive. *Id.* at 794-97, 568 P.2d at 1240-43. *Newsome* cited approvingly to a California Supreme Court case which held that the public's right to access government records is "not absolute, but [is] subject to an implied rule of reason" by which a court can create additional exceptions to disclosure. *Id.* at 797, 568 P.2d at 1243 (quoting *Bruce v. Gregory*, 423 P.2d 193, 199 (Cal. 1967)).

**{15}** Following *Bruce* and other cases, *Newsome* adopted an approach whereby courts determine whether records not specifically exempted by IPRA nonetheless should be withheld from the requester on the grounds that disclosure "would not be in the public interest." 90 N.M. at 798, 568 P.2d at 1244. *Newsome* stated that

> [i]t would be helpful to the courts for the Legislature to delineate what records are subject to public inspection and those that should be kept confidential in the public interest. Until the Legislature gives us direction in this regard, the courts will have to apply the "rule of reason" to each claim for public inspection as they arise.

*Id.* at 797, 568 P.2d at 1243.

**{16}** The Legislature has since responded to the Court's request, obviating any need that existed for application of the "rule of reason," by enumerating specific exceptions to disclosure, including attorney-client privilege, § 14-2-1(A)(6), and maintaining the exception "as otherwise provided by law," § 14-2-1(A)(8). Accordingly, courts now should restrict their analysis to whether disclosure under IPRA may be withheld because of a specific exception contained within IPRA, or statutory or regulatory exceptions, or privileges adopted by this Court or grounded in the constitution. Therefore, cases applying the "rule

7

of reason" to all of the exceptions enumerated by the Legislature are overruled to the extent they conflict with this Opinion. *See*, *e.g.*, *City of Farmington v. The Daily Times*, 2009-NMCA-057, ¶ 8, 146 N.M. 349, 210 P.3d 246; *Bd. of Comm'rs of Doña Ana Cnty. v. Las Cruces Sun-News*, 2003-NMCA-102, ¶ 11, 134 N.M. 283, 76 P.3d 36.

## B.    Executive Privilege

**{17}**    Executive privilege is a broad term used to define the many asserted justifications for nondisclosure by the executive branch of the government to its co-equal branches and to the public. *See In re Sealed Case*, 121 F.3d 729, 736-37 (D.C. Cir. 1997) ("Since the beginnings of our nation, executive officials have claimed a variety of privileges to resist disclosure of information the confidentiality of which they felt was crucial to fulfillment of the unique role and responsibilities of the executive branch of our government."); *see generally EEOC v. Los Alamos Constructors, Inc.*, 382 F. Supp. 1373, 1375-83 (D.N.M. 1974) (providing a thorough survey of cases discussing assertions of executive privilege from the presidencies of Washington through Nixon); Gerald Wetlaufer, *Justifying Secrecy: An Objection to the General Deliberative Privilege*, 65 Ind. L.J. 845, 845 n.3 (1990) (identifying the various subspecies of privilege that have been invoked by the executive branch). We now review the development of executive privilege in the federal courts, then inquire how other states have addressed the privilege, and conclude by determining the contours of the privilege that the Governor may assert pursuant to our state constitution.

### 1.    Executive Privilege in the Federal Courts

**{18}**    Federal courts have long recognized that the President of the United States, the nation's executive, may withhold military and state secrets. *See Gen. Dynamics Corp. v. United States*, ___ U.S. ___, ___, 131 S. Ct. 1900, 1905 (2011) ("We have recognized the sometimes-compelling necessity of governmental secrecy by acknowledging a Government privilege against court-ordered disclosure of state and military secrets."); *see also United States v. Nixon*, 418 U.S. at 683, 710-11 (1974). Federal courts also have permitted the executive to withhold information about government informants and pending investigations under some circumstances. *See In re Sealed Case*, 121 F.3d at 736-37. The two categories of federal executive privilege that are of "primary" importance to this appeal, though, are the presidential communications privilege and the deliberative process privilege. *Republican Party*, 2010-NMCA-080, ¶ 18.

### a.    *Presidential Communications Privilege*

**{19}**    The United States Court of Appeals for the District of Columbia Circuit has succinctly described the difference between the presidential communications privilege and the deliberative process privilege:

> While the presidential communications privilege and the deliberative process privilege are closely affiliated, the two privileges are distinct and

have different scopes. Both are executive privileges designed to protect executive branch decisionmaking, but one applies to decisionmaking of executive officials generally, the other specifically to decisionmaking of the President. The presidential privilege is rooted in constitutional separation of powers principles and the President's unique constitutional role; the deliberative process privilege is primarily a common law privilege. . . .

In addition, unlike the deliberative process privilege, the presidential communications privilege applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones.

*In re Sealed Case*, 121 F.3d at 745 (citations omitted).

{20} The presidential communications privilege was explicitly established by the United States Supreme Court in *Nixon*, 418 U.S. 683. In that case, President Nixon argued that he was not required to comply with a subpoena from the Watergate special prosecutor. *Id.* at 687-88. The Court agreed that communications between certain high-level advisers and the President are presumptively privileged because "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.* at 708. The Court found such protection from public scrutiny to be justified in part by the "unique role" of the President under the United States Constitution, including the President's authority to conduct foreign affairs. *Id.* at 715-16. This privilege, the Court determined, "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.* at 708. The same concern for separation of powers, however, required the Court to reject "an absolute, unqualified privilege" which would impair "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions." *Id.* at 707. In *Nixon*, the Court concluded that the assertion of executive privilege "cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id.* at 713; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 448-49 (1977) (holding that a former President could also invoke the communications privilege, but that such a claim is given less weight than a claim of privilege asserted by a sitting President).

{21} Two cases from the federal circuit court for the District of Columbia are instructive in considering the parameters of the presidential communications privilege. *In re Sealed Case* involved a subpoena duces tecum served on the White House Counsel by a grand jury that was investigating a cabinet secretary. 121 F.3d at 734-35. The White House identified responsive documents, producing some and withholding others, originally on the stated basis of the deliberative process privilege. *Id.* at 735. After the Office of the Independent Counsel moved to compel production, *id.* at 734-36, the White House later additionally invoked the presidential communications privilege with respect to the withheld documents, *id.* at 735 & n.2. *In re Sealed Case* reaffirmed that in *Nixon* "the existence of the presidential

9

[communications] privilege was definitively established as a necessary derivation from the President's constitutional status in a separation of powers regime." *Id.* at 739-40. The court then proceeded to consider the President's invocation of the presidential communications privilege in the case at hand. *Id.* at 740. President Clinton had not viewed any of the reports or drafts for which the executive privilege was being asserted. *Id.* at 746. Noting that *Nixon* did not clarify whether the privilege applied only to communications directly with the President, or also included communications with advisers who assisted the President in making policy decisions, *id.* at 747, the court reviewed the reasons in favor of both a narrow and a broad construction of the privilege. A concern for separation of powers supported restricting the privilege to communications that directly included the President, as "the Constitution assigns [Article II] responsibilities to the President alone, arguably the privilege of confidentiality that derives from them also should be the President's alone." *Id.* at 748. A narrow construction of the privilege would also facilitate open government, especially "where the public's ability to know how its government is being conducted is at stake." *Id.* at 749.

**{22}** The court concluded, however, that the "arguments for a limited extension of the privilege beyond the President to his immediate advisors [are] more convincing." *Id.* Stating that "pre-decisional documents are usually highly revealing as to the evolution of advisers' positions and as the different policy options considered along the way," *In re Sealed Case* concluded that such documents should be covered by the presidential communications privilege because "[i]f these materials are not protected by the presidential privilege, the President's access to candid and informed advice could well be significantly circumscribed." *Id.* at 750.

**{23}** Although concluding that the presidential communications privilege extended beyond communications made directly to the President, *In re Sealed Case* was careful not to interpret the privilege too broadly. "[T]he privilege should apply only to communications authored or solicited and received by those members of an immediate White House advisor's staff who have broad and significant responsibility for investigating and formulating the advice to be given to the President on the particular matter to which the communications relate." *Id.* at 752. The court then determined under this standard that the privilege applied to documents authored by the White House counsel, deputy counsel, chief of staff, and press secretary, notes at meetings attended by these advisers, documents prepared by associate counsel, and a memo prepared by a legal intern at the direction of counsel. *Id.* at 758. Ultimately, however, the court concluded that although these documents fell under the privilege, the Office of the Independent Counsel demonstrated sufficient need to overcome the assertion of privilege in most instances, and therefore the court of appeals remanded to the district court for further review. *Id.* at 762.

**{24}** Another instructive case, *Judicial Watch, Inc. v. Department of Justice*, confirmed the narrow scope of the presidential communications privilege in the context of a Freedom

of Information Act (FOIA)[3] request for documents relating to the President's exercise of his pardon power.  365 F.3d 1108, 1109-10 (D.C. Cir. 2004).  The court of appeals refused to extend the presidential communications privilege to all officials whose duties included preparing documents for use in advising the President on the exercise of his pardon power.  The *Judicial Watch* court relied on *In re Sealed Case* in reaching the conclusion that "the presidential communications privilege applies only to those pardon documents '*solicited and received*' by the President or his *immediate* White House advisers who have 'broad and significant responsibility for investigating and formulating the advice to be given the President.'"  *Id.* at 1114 (quoting *In re Sealed Case*, 121 F.3d at 752) (emphases added).

{25}    *Judicial Watch* stated, correctly in our view, that "the demands of the privilege become more attenuated the further away the advisers are from the President operationally." 365 F.3d at 1115.  *Judicial Watch* determined that the privilege did not apply to documents obtained from other agencies, particularly when they were never submitted to the Office of the President, because "the same confidentiality and candor concerns calling for application of the presidential communications privilege in [the *Nixon* cases] and *In re Sealed Case* do not apply as forcefully."  *Id.*  As a result, the court held that internal agency documents were not protected by the presidential communications privilege.  *Id.* at 1118.  "Extending the presidential communications privilege to cover such internal Department documents would be both contrary to executive privilege precedent and considerably undermine the purposed of FOIA to foster openness and accountability in government."  *Id.*  The pardon attorney, a Department of Justice official who "is at least twice removed from the President," was not permitted to invoke the presidential communications privilege, *id.* at 1120, nor were the deputy attorney general or his staff, *id.* at 1121.  Extension of the privilege to such individuals who were not close advisers of the President, "with the attendant implication for expansion to other Cabinet officers and their staffs, would . . . 'pose a significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President.'"  *Id.*  (quoting *In re Sealed Case*, 121 F.3d at 752).

### b.    *Deliberative Process Privilege*

{26}    Unlike the presidential communications privilege, which is "rooted in constitutional separation of powers principles and the President's unique constitutional role," *In re Sealed Case*, 121 F.3d at 745, the deliberative process privilege is a creation of the common law and is invoked primarily by executive agencies.  *Id.* at 737.  The deliberative process privilege has been developed with the stated purpose of protecting the "frank and open discussions of ideas" and "the confidentiality of the give-and-take that occurs among agency members in

---

[3] FOIA, 5 U.S.C. § 552(a) (1966, as amended through 2009), the federal analogue to IPRA, "requires federal agencies to make Government records available to the public" upon request, subject to enumerated exceptions.  *Milner v. Dep't of the Navy*, ___ U.S. ___, ___, 131 S. Ct. 1259, 1261-62 (2011).

11

the formulation of policy." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988). Unlike the presidential communications privilege, the deliberative process privilege only covers material that is predecisional and deliberative; it "does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d at 737.

**{27}** The deliberative process privilege has been incorporated into FOIA, which contains an exemption expressly privileging "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption (Exemption 5) allows for the withholding of all documents that would be privileged in litigation, and also has been interpreted to privilege predecisional and deliberative agency communications. *See Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (noting that both the attorney work product privilege and the deliberative process privilege fall under Exemption 5 of FOIA); *Tax Analysts v. IRS*, 294 F.3d 71, 76 (D.C. Cir. 2002) (Exemption 5 has been "interpreted to encompass, *inter alia*, three evidentiary privileges: the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege."). Consistent with the recognized core purpose of the deliberative process privilege, Exemption 5 protects only predecisional agency communications, not communications about decisions that have already been made. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975) ("[I]t is difficult to see how the quality of a decision will be affected by communications . . . occurring after the decision is finally reached.").

**{28}** FOIA and IPRA are not identical, as we recently explained in *San Juan Agric. Water Users Ass'n*. 2011-NMSC-011, ¶¶ 38-41 (discussing many of the differences between IPRA and FOIA and concluding that federal court interpretations and applications of FOIA are not binding on New Mexico courts construing IPRA). Although the two statutes share the common purpose of providing public access to government documents, FOIA jurisprudence is of limited persuasion when interpreting IPRA, because IPRA ensures greater access to government records than does FOIA. *See id.* ¶ 38 (stating that IPRA's text "underscore[s] a legislative intent to ensure that New Mexicans have the greatest possible access to their public records"); *cf. Hearst Corp. v. Hoppe*, 580 P.2d 246, 249, 251-52 (Wash. 1978) (noting that the state disclosure act "closely parallels FOIA . . . and thus judicial interpretations of that act are particularly helpful in construing our own" (internal citation omitted)).

### 2. Executive Privilege in Other States

**{29}** States that recognize a gubernatorial version of executive privilege have premised that privilege on an analogy between the relationship of a governor to his or her state, and that of the President to the United States. *See Hamilton v. Verdow*, 414 A.2d 914, 921 (Md. 1980) ("Our cases have recognized . . . that the Governor bears the same relation to this State as does the President to the United States, and that generally the Governor is entitled

12

to the same privileges and exemptions in the discharge of his duties as is the President."). Consequently, the few state high courts that have considered the issue explicitly have concluded that governors enjoy an executive communications privilege analogous to the federally recognized presidential communications privilege. *See, e.g.*, *Nero v. Hyland*, 386 A.2d 846, 853 (N.J. 1978). For example, over a strong dissent, the Ohio Supreme Court held that the governor may assert a qualified executive communications privilege (which that court denominated as a "gubernatorial-communications privilege."). *State ex rel. Dann v. Taft*, 848 N.E.2d 472 (Ohio 2006). The court determined that the governor

> has a qualified gubernatorial-communications privilege that protects communications to or from the governor when the communications were made for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking. This qualified gubernatorial-communications privilege is overcome when a requester demonstrates that the requester has a particularized need to review the communications and that that need outweighs the public's interest in according confidentiality to communications made to or from the governor.

*Id.* at 485. A dissent from the majority opinion argued that the recognition of the executive communications privilege was contrary to the policy of openness of the Ohio government. *Id.* at 490 (Pfeifer, J., dissenting). That dissenting opinion also disputed the conclusion that a governor should be entitled to the same privileges as the President, nothing that "though [the President's and a governor's] roles may be analogous, their duties and responsibilities are far from equal," and urging that "[t]he scale of the privilege should reflect the difference in scale between the offices." *Id.* at 491.

{30}   Although only a relative handful of state courts have ruled on the existence of an executive communications privilege, a greater number have addressed the applicability of a deliberative process privilege. Some states, parallel to the deliberative process privilege created by the federal courts, recognize a privilege available not only to the governor, but also to executive agencies responding to public records requests. *See, e.g.*, *Gwich'in Steering Comm. v. Office of the Governor*, 10 P.3d 572, 578-79 (Alaska 2000); *City of Colorado Springs v. White*, 967 P.2d 1042, 1049-50 (Colo. 1998) (en banc); *DR Partners v. Bd. of Cnty. Comm'rs of Clark Cnty.*, 6 P.3d 465, 469-70 (Nev. 2000); *In re Liquidation of Integrity Ins. Co.*, 754 A.2d 1177, 1182 (N.J. 2000); *Commonwealth v. Vartan*, 733 A.2d 1258, 1263-64 (Pa. 1999); *Herald Ass'n, Inc. v. Dean*, 816 A.2d 469, 474-75 (Vt. 2002). In a few instances, state public records statutes track Exemption 5 of FOIA and expressly exempt from disclosure agency-generated documents reflecting policy deliberations. *See, e.g.*, *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 360 (Tex. 2000) (citing Tex. Gov't Code Ann. § 552.111 (West 1993)). More typically, state high courts recognize a deliberative process privilege based purely on common law principles. *See, e.g.*, *City of Colorado Springs*, 967 P.2d 1042, 1049-51 (distinguishing the deliberative process privilege's common law origin from the executive communications privilege's constitutional basis); *see also Gwich'in Steering Comm.*, 10 P.3d at 578 (noting that the deliberative

13

process privilege is not grounded in "constitutional notions of separation of powers").

{31}   Other states have considered and rejected a common law deliberative process privilege.  *See, e.g.*, *Rigel Corp. v. Arizona*, 234 P.3d 633, 640-41 (Ariz. Ct. App. 2010); *People ex rel. Birkett v. City of Chicago*, 705 N.E.2d 48, 53 (Ill. 1998); *News & Observer Publ'g Co. v. Poole*, 412 S.E.2d 7, 20 (N.C. 1992) ("We refuse to engraft upon our Public Records Act exceptions based on common-law privileges, such as a 'deliberative process privilege,' to protect items otherwise subject to disclosure."); *Sands v. Whitnall Sch. Dist.*, 754 N.W.2d 439, 458 (Wis. 2008) ("Wisconsin does not recognize a deliberative process privilege. [State statute] precludes the extension of common law privileges by the court on a case-by-case basis, but rather requires common law privileges not originating in the constitution to be adopted by statute or court rule."); *see also  Freudenthal v.  Cheyenne Newspapers, Inc.*, 233 P.3d 933, 942 (Wyo. 2010) (declining to rule on whether Wyoming's public records law incorporates the deliberative process privilege).

{32}   One state, Massachusetts, does not recognize *any* form of executive privilege.  The Massachusetts Supreme Judicial Court held that neither constitutional nor common law executive privilege could be invoked to shield documents from production in a civil action. *Babets v. Sec. of the Exec. Office of Human Servs.*, 526 N.E.2d 1261, 1264 (Mass. 1988). The court in *Babets* concluded that the doctrine of separation of powers did not compel recognition of an executive privilege, as "[w]hat [the] doctrine interdicts is the interference by one branch of government with the power or functions of another," and the decision not to recognize an executive privilege "does not constitute the exercise of nonjudicial power or interfere with the Executive's power."  *Id.* at 1263.  The court then refused to create a common law executive privilege, noting that privileges in Massachusetts are normally conferred  by the legislature.  *Id.* at 1264-65.  The court rejected the executive's argument that the privilege was necessary to promote "candid and unconstrained communication and exchange of ideas between and among executive policymakers and their advisors   . . . in light of the long history of the Commonwealth and the lack of any showing of real harm that has accrued from the absence of the privilege."  *Id.* at 1266.

### 3.      Executive Privilege in New Mexico

{33}   Having reviewed executive privilege in the federal courts and our sister states, we now turn to the proper scope of the privilege in New Mexico.  The assertion of executive privilege in response to an IPRA request is a matter of first impression for this Court.  We previously have concluded, however, that some form of executive privilege is mandated by the separation of powers clause of the New Mexico Constitution.  *First Judicial*, 96 N.M. at 257, 629 P.2d at 333.

{34}   We decided *First Judicial*, our formative opinion on executive privilege, in response to a discovery dispute in civil cases arising from the 1980 state penitentiary riot.  The Attorney General conducted an extensive investigation into the riot, and claimed that all of the information gathered during the course of that investigation was privileged from

14

discovery in any matter. *Id.* at 256-57, 629 P.2d at 332-33. We agreed with the Attorney General that he was entitled to withhold information pursuant to executive privilege. *Id.* at 258, 629 P.2d at 334.

**{35}**   *First Judicial* explained that "for a privilege to exist in New Mexico, it must  be recognized or required by the Constitution, the Rules of Evidence, or other rules of this Court." *Id.* at 257, 629 P.2d at 333. We reaffirm that holding here. We then held that "recognition of an executive privilege is required by the Constitution of the State of New Mexico[,]" specifically the separation of powers clause contained in Article III. *Id.* Citing *Nixon*, 418 U.S. 683, and *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C. 1966), *aff'd* 384 F.2d 979 (D.C. Cir.1967), we stated:

> The purposes of the executive privilege are to safeguard the decision-making process of the government by fostering candid expression of recommendations and advice and to protect this process from disclosure. Executive personnel who fear or expect public dissemination of their remarks may temper their comments because of their concern for their own personal interests, safety, or reputation.

*Id.* at 258, 629 P.2d at 334. The executive privilege *First Judicial* recognized is not absolute, as that "would conflict with the constitutional duty of the courts to do justice in matters brought before it." *Id.*

**{36}**   *First Judicial* went on to instruct that in the context of civil discovery, the trial court must determine whether the privilege was properly invoked and then balance the competing interests in order to determine whether the privilege has been overcome. *Id. First Judicial*'s balancing test requires that the movant show good cause for the production of the material over which the privilege has been asserted. *Id.* The trial court must then conduct an in camera review of the material to determine if it "would be admissible in evidence and that it is otherwise unavailable by exercise of reasonable diligence." *Id.* Finally, the trial court must assure that the balance of interests weighed in favor of disclosure. *Id. First Judicial* identified the competing interests as "the public's interest in preserving confidentiality to promote intra-governmental candor," and "the individual's need for disclosure of the particular information sought." *Id.* (citing *Nixon*, 418 U.S. 712, and *Armstrong Bros. Tool Co. v. United States*, 463 F. Supp. 1316, 1320 (Cust. Ct. 1979) (discussing the balancing necessary before an assertion of deliberative process privilege will be honored)). The competing interests implicated by a claim of executive privilege are more accurately characterized as the public's interest in disclosure weighed against the government's interest in nondisclosure. *See Lamy v. N.H. Pub. Utils. Comm'n*, 872 A.2d 1006, 1010 (N.H. 2005) (identifying the central tension as between "the public interest in disclosure against the government interest in nondisclosure" as well as any individual privacy interests in favor of nondisclosure); *Denver Post Corp. v. Ritter*, 230 P.3d 1238, 1240 (Colo. App. 2009) (noting that Colorado's public records law "balances the public's interest in access to information . . . against the privacy interests of public officials and employees"). As we explain below,

when the Governor invokes executive privilege in response to an IPRA request, however, courts do not apply *First Judicial*'s balancing test.

**{37}**    In contrast to its recognition of a constitutionally-based executive communications privilege, *First Judicial* rejected the assertion of a common law "public interest privilege." *Id.* The Attorney General had argued that the Court should recognize such a privilege to protect his communications with individuals outside of the executive department exchanged in the course of his investigation. *Id.* at 258-59, 629 P.2d at 334-35. In the Attorney General's view, the "rule of reason" exception to disclosure set forth in *Newsome*, discussed above, supported the existence of a public interest privilege. *Id.* at 260, 629 P.2d at 336. *First Judicial* concluded, however, that neither the constitution nor the evidentiary rules mandated such a privilege or any other common law evidentiary privileges, noting that if such privileges were accepted, "there would be no limit to the communications that could be protected." *Id.* at 260, 629 P.2d at 336. Two justices dissented in part in *First Judicial*, arguing that the Court should recognize a public interest privilege. *Id.* at 262, 629 P.2d at 338 (Easley, C.J., dissenting in part and concurring in part). The dissenting opinion concluded that the constitution supported the existence of a privilege for information gathered from the public by the Attorney General in the course of an investigation. *Id.* In addition, the dissent opined that New Mexico had adopted the common law privileges, and urged that *Newsome*'s rule of reason provided the basis for the public interest privilege in this case. *Id.* at 263, 629 P.2d at 339.

**{38}**    *First Judicial*'s acknowledgment of constitutionally-based privileges and rejection of common law privileges is analogous to the New Mexico Rules of Evidence, which contemplate privileges only as "required by [the] constitution, [the Rules of Evidence] or in other rules adopted by the supreme court," not common law privileges. Rule 11-501. We discern no legally sound reason to recognize privileges applicable to public records requests where we have not done so in the context of litigation. This conclusion flows from the language of IPRA itself, which mandates that New Mexicans "are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees." Section 14-2-5. Allowing the executive to resist disclosure on the basis of a common law deliberative process privilege not otherwise recognized under our state's constitution would frustrate IPRA's guiding purpose of promoting government transparency. *See San Juan Agric. Water Users Ass'n*, 2011-NMSC-011, ¶ 16 ("In order for government to truly be of the people and by the people, and not just for the people, our citizens must be able to know what their own public servants are doing in their name."). As a result, consistent with *First Judicial* we reject the Court of Appeals' adoption of the common law deliberative process privilege.

**{39}**    We reaffirmed *First Judicial*'s outlining of executive privilege in *Estate of Romero.* 2006-NMSC-028, ¶ 12. In that case, the City of Santa Fe attempted to assert executive privilege to preclude discovery of law enforcement investigatory materials. *Id.* ¶ 10. We refused the city's invitation to revisit *First Judicial*'s disallowance of common law evidentiary privileges. *Id.* ¶ 11. We also rejected an expansion of the executive privilege

16

to city agencies, underscoring that constitutional separation of powers does not extend beyond the entities "contemplated in the Constitution as part of the executive branch." *Id.* ¶ 13 (citing *State ex rel. Chapman v. Truder*, 35 N.M. 49, 52, 289 P. 594, 596 (1930)).

**{40}** We acknowledge that *First Judicial* used language consistent with both an executive communications privilege and a deliberative process privilege. At its heart, *First Judicial* recognized a form of executive privilege based on separation of powers principles enshrined in our state constitution, 96 N.M. at 257, 629 P.2d at 333, that would necessarily embrace an executive communications privilege but exclude a common law deliberative process privilege. *First Judicial* also identified "the valid need for protection of *communications*" within the executive branch. *Id.* at 258, 629 P.2d at 334 (emphasis added).

**{41}** On the other hand, *First Judicial* described the purpose of executive privilege as "to safeguard the decision-making process of the government by fostering candid expression of recommendations and advice and to protect this process from disclosure," *id.*, a rationale that, depending on the actors involved, could support the executive communications privilege, the deliberative process privilege, or both. We are not persuaded, though, that *First Judicial* clearly embraced the deliberative process privilege. Although the Court of Appeals in this case relied on a general citation to *Carl Zeiss* as an indication that *First Judicial* intended the deliberative process privilege to be included in the constitutionally-mandated executive privilege, *Republican Party*, 2010-NMCA-080, ¶ 32, we find it unlikely that this Court intended to adopt the common law deliberative process privilege endorsed by *Carl Zeiss* shortly after disavowing common law privileges. In fact, *First Judicial* applied the privilege to documents that appear to have been neither "communications" nor "deliberative," but instead consisted of written responses to interview questionnaires and other information compiled by the Attorney General's staff in the course of investigating the penitentiary riot. *Id.* at 256-57, 629 P.2d at 332-33.

**{42}** We disavow *First Judicial* to the extent that it could be read to support the adoption of the deliberative process privilege, *see Republican Party*, 2010-NMCA-080, ¶ 32, and hold emphatically that no deliberative process privilege exists under New Mexico law. In addition to apparently conflating the executive communications privilege and the deliberative process privilege, *First Judicial* also left many unanswered questions about the boundaries of executive privilege. At the time we decided *First Judicial*, executive privilege jurisprudence was in its early stages of development; although we cited generally to *Nixon*, we did not discuss the different categories of the executive privilege that courts were beginning to recognize, nor the rationales for how to define the contours of that privilege.

**{43}** Following the principles established by *First Judicial*, we hold that our jurisprudence supports a limited form of executive privilege derived from the constitution. This privilege is similar in origin, purpose, and scope to the presidential communications privilege recognized by the federal courts and the executive communications privilege recognized by some other state high courts. Having determined the form of executive privilege recognized under New Mexico law, we now clarify which documents may potentially qualify for the

17

privilege and who may invoke the privilege. The Governor, of course, may opt to exercise his or her executive privilege in a more limited fashion than provided by the constitution, but the delineation of the privilege's outer limits remains this Court's responsibility: "[I]t is the judiciary (and not the executive branch itself) that is the ultimate arbiter of executive privilege." *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 103 (D.D.C. 2008); *see also Nixon v. Sirica*, 487 F.2d 700, 713 (D.C. Cir. 1973) (Holding that applicability of executive privilege is for the courts, not the executive itself, to define).

**{44}** First, executive privilege in New Mexico can only apply to "communications," because the privilege exists solely to protect the executive's "access to candid advice," *In re Sealed Case*, 121 F.3d at 745, not to keep all information related to the executive beyond the reach of the public. *Cf. Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 592 F. Supp. 2d 111, 118-19 (D.D.C. 2009) ("[T]he presidential communications privilege, as its name and the Circuit's opinions suggest, extends only to *communications*."). The court in *Citizens for Responsibility & Ethics in Washington* determined that White House visitor logs, the records at issue in that case, "shed[] no light on the content of communications between the visitor and the President or his advisers, whether the communications related to presidential deliberation or decisionmaking, or whether any substantive communications even occurred." We agree that the privilege can only extend to documents that are communicative in nature.

**{45}** More specifically, in light of the privilege's central purpose of "fostering candid expression of recommendations and advice" to the Governor, *First Judicial*, 96 N.M. at 258, 629 P.2d at 334, the privilege is "limited to materials connected to [the chief executive's] decisionmaking, as opposed to other executive branch decisionmaking," *In re Sealed Case*, 121 F.3d at 745, and "should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the [chief executive]." *Id.* at 752. Furthermore, because the privilege derives its force and legitimacy from the constitution, the communications at issue must relate to the Governor's constitutionally-mandated duties. *Cf. id.* at 748 (identifying "the President's Article II powers and responsibilities as the constitutional basis of the presidential communications privilege" (citing *Nixon*, 418 U.S. at 705 & n.16)); *Judicial Watch*, 365 F.3d at 1115 (concluding that "the presidential communications privilege is rooted in the President's need for confidentiality in the communications of his office in order to effectively and faithfully carry out his Article II duties," and noting that both *Judicial Watch* and *In re Sealed Case* involved a claim of privilege over documents relating to "a non-delegable duty of the President under Article II, Section 2 of the Constitution" (internal quotation marks and citation omitted)). We see no basis for sanctioning an executive communications privilege broader than the privilege afforded to the President of the United States. *See Dann*, 848 N.E.2d at 490 (Pfeifer, J., dissenting). In New Mexico, then, to be eligible for protection from disclosure by operation of the executive communications privilege, the documents at issue must concern the Governor's decisionmaking in the realm of his or her core duties.

**{46}** Second, our executive privilege does not cover all communications in furtherance of gubernatorial decisionmaking, but is limited to those communications to or from individuals in very close organizational *and* functional proximity to the Governor. In *In re Sealed Case*, the D.C. Circuit approved a "limited extension of the privilege beyond the President to his immediate advisers." 121 F.3d at 749. While not deciding exactly "how far down the chain of command the presidential communication privilege extends," *id.* at 749-50, the court limited the privilege to communications authored or received by the President's closest advisers, "who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *Id.* at 752. The court explained that "[o]nly communications at that level are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers." *Id.* We find persuasive the analysis from *In re Sealed Case* that the executive (here, the Governor) need not have personally authored, or solicited and received, a document in order for the privilege to apply. To be subject to the privilege, however, the document in question must have been authored, or solicited and received, by either the Governor or an "immediate adviser," *Judicial Watch,* 365 F.3d at 1115, with "broad and significant responsibility" for assisting the Governor with his or her decisionmaking. *In re Sealed Case*, 121 F.3d at 752.

**{47}** Third, the privilege, rooted as it is in separation of powers, is not available to the entire executive branch, as Respondents originally argued, but instead reserved to the constitutionally-designated head of the executive branch—the Governor. *See Dann*, 848 N.E.2d at 485-86 ("[A] governor must formally assert the privilege by declaring that he or she has reviewed the requested materials and concluded that the materials meet the criteria of the privilege, i.e., that they constitute a communication either to or from him [or her] and were made for the purpose of fostering informed and sound gubernatorial deliberations, policymaking and decisionmaking." (footnote omitted)); *cf. Blumenthal v. Drudge*, 186 F.R.D. 236, 242 (D.D.C. 1999) ("The President alone possesses [the] authority" to invoke executive privilege.); *but cf. Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (permitting executive agency to invoke presidential communications privilege on behalf of unnamed "senior presidential advisers"). The D.C. Circuit has noted that "[t]he issue of whether a President must personally invoke the privilege remains an open question." *Judicial Watch*, 365 F.3d at 1114. We hold, however, that while the privilege can extend to communications *authored* by close advisers, the privilege's constitutional foundation requires limiting its *invocation* to the Governor. As we do not recognize a common law deliberative process privilege, cabinet agencies that are simply under the ultimate control of the Governor may not assert a privilege to protect internal memoranda, contrary to the Court of Appeals' determination that the MVD could do so because it "is a cabinet department in the executive branch." *Republican Party*, 2010-NMCA-080, ¶ 29.

**{48}** We set forth these limitations in order to minimize unwarranted claims of privilege, lessen undue burden on courts in resolving privilege disputes, and curb encroachments on the public's access to records relating to the activities of their government. These requirements for invocation of the privilege are consistent with the legislative purpose of

19

IPRA: "[T]hat all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees." Section 14-2-5.

**{49}** Importantly, as we explained in *First Judicial*, 96 N.M. at 258, 629 P.2d at 334, executive privilege in New Mexico is a qualified privilege. *First Judicial* directed courts to "balance the public's interest in preserving confidentiality to promote intra-governmental candor with the individual's need for disclosure of the particular information sought." *Id.* As we discuss above, this balancing test requires a show of "good cause for the production of the requested information." *Id.* If the party seeking disclosure makes such a showing, the court then conducts an in camera review of the disputed documents and should order disclosure "provided that the public's interest in preserving confidentiality does not outweigh the specific needs of the movant." *Id.* *First Judicial*, however, involved a discovery dispute, not a public records request. Unlike a party seeking discovery in civil litigation, a party requesting public records under IPRA need not assert any particular need for disclosure. Section 14-2-8(C) ("No person requesting records shall be required to state the reason for inspecting the records."). *First Judicial*'s instruction that courts should balance the competing needs of the executive and the party seeking disclosure, therefore, does not apply to claims of executive privilege under IPRA. Instead, courts considering the application of executive privilege to an IPRA request must independently determine whether the documents at issue are in fact covered by the privilege, and whether the privilege was invoked by the Governor, to whom the privilege is reserved. Where appropriate, courts should conduct an in camera review of the documents at issue as part of their evaluation of privilege.

**{50}** Under these standards, it is evident that the records that prompted the underlying lawsuit here would not qualify for the privilege. The records that were at issue are principally internal emails between MVD staff, not communications with Governor Richardson or his immediate advisers. The record only contains redacted versions of the emails, so it is impossible to ascertain their contents, but Respondents never claimed that the emails contained policy recommendations to the former Governor or otherwise evidenced his deliberations on a policy matter. Ultimately, Respondents acknowledged that the communications were not directed to Governor Richardson or his immediate advisers and were not "used by any such official to make policy recommendations or decisions," but instead "involve employees implementing policies and otherwise performing the routine functions of the agencies for which they work." In addition, the entity that attempted to assert privilege over the documents was the MVD, not the Governor, which in itself renders that claim of privilege invalid.

## IV. CONCLUSION

**{51}** Transparency is an essential feature of the relationship between the people and their government. This foundational principle far predates IPRA, New Mexico's statehood, and even George Washington's first term as our nation's President. In 1788, during debate on

the ratification of the United States Constitution, the patriot Patrick Henry so eloquently stated:

> Give us at least a plausible apology why Congress should keep their proceedings in secret. . . . The liberties of a people never were, nor ever will be, secure, when the transactions of their rulers may be concealed from them. . . . [T]o cover with the veil of secrecy the common routine of business, is an abomination in the eyes of every intelligent man, and every friend to this country.

*3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, As Recommended by the General Convention at Philadelphia in 1787* 169-70 (Jonathan Elliott ed., 1881).

**{52}** The constitution is the heart, the soul, the genius of our system of government, and its safeguarding is this Court's "highest duty and most sacred function." *Dolese v. Pierce*, 16 N.E. 218, 221 (Ill. 1888). Our constitution expressly limits the powers of the three co-equal branches, and is at its apex when the people have access to the information necessary to determine whether their elected officials are faithfully fulfilling their duties. To protect the people's vital right to access information about the workings of government, we hold that executive privilege must be confined to the constitutional limits set forth in this Opinion.

**{53}** **IT IS SO ORDERED**.

_____
**PATRICIO M. SERNA, Justice**


**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**

**Topic Index for *Republican Party of NM v. NM Taxation & Rev. Dept*., Docket No. 32,524**

**CONSTITUTIONAL LAW**
Mootness
New Mexico Constitution, General

**GOVERNMENT**
Executive Branch
Executive Privilege
Public Records

**MISCELLANEOUS STATUTES**
Inspection of Public Records Act